## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| R.J. REYNOLDS TOBACCO COMPANY,  ) | |
| 401 N. Main Street                                ) | |
| Winston-Salem, NC  27101,                ) | |
|                                                              ) | |
| SANTA FE NATURAL TOBACCO        ) | |
| COMPANY, INC.                                    ) | |
| One Plaza La Prensa                             ) | |
| Santa Fe, NM  87507                            ) | |
|                              Plaintiffs,            ) | |
|                                                              ) | |
|             v.                                             ) | Civil Action No. 14-1388 |
|                                                              ) | |
| UNITED STATES DEPARTMENT OF     ) | |
| AGRICULTURE                                     ) | |
| 1400 Independence Avenue, SW        ) | |
| Washington, DC  20250;                       ) | |
|                                                              ) | |
| FARM SERVICE AGENCY,                     ) | |
| 1400 Independence Avenue, SW        ) | |
| Washington, DC  20250;                       ) | |
|                                                              ) | |
| COMMODITY CREDIT CORPORATION,  ) | |
| 1400 Independence Avenue, SW        ) | |
| Washington, DC  20250;                       ) | |
|                                                              ) | |
| TOM VILSACK, in his official capacity   ) | |
| as Secretary of the U.S. Department of  ) | |
| Agriculture,                                          ) | |
| 1400 Independence Avenue, SW        ) | |
| Washington, DC  20250; and               ) | |
|                                                              ) | |
| JUAN M. GARCIA, in his official capacity  ) | |
| as the Administrator of the Farm Service  ) | |
| Agency and Executive Vice President of the  ) | |
| Commodity Credit Corporation,         ) | |
| 1400 Independence Avenue, SW        ) | |
| Washington, DC  20250,                       ) | |
|                              Defendants.         ) | |
| _____ ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs R.J. Reynolds Tobacco Company ("RJRT") and Santa Fe Natural Tobacco Company ("Santa Fe") bring this complaint seeking declaratory and injunctive relief.

## PRELIMINARY STATEMENT

1.      The unreported manufacturing of cigarettes, distributed and sold tax-free in violation of state and federal law, is notorious.  This illegal activity costs state and federal governments, as well as law-abiding cigarette manufacturers and importers, billions of dollars annually in lost revenues.

2.      This action challenges a decision by the U.S. Department of Agriculture ("USDA") that unreasonably and in violation of clear statutory mandates requires law-abiding cigarette manufacturers and importers to cover the unpaid financial obligations of law-breaking cigarette manufacturers.

3.      The Fair and Equitable Tobacco Reform Act of 2004 ("FETRA" or "the Act"), 7 U.S.C. §§ 518 *et seq*., created the Tobacco Trust Fund to make transition payments to the recipients of phased-out federal tobacco subsidies and other price supports.  To cover the trust fund's outlays, Congress directed USDA to levy quarterly assessments on all manufacturers and importers of tobacco products.

4.      Congress did not leave it up to USDA to decide how to calculate those assessments.  Instead, FETRA directs USDA to impose assessments on a pro rata basis reflecting *every* manufacturer's and importer's proportional market share within each of six classes of tobacco products, including cigarettes.  Under the

statute, USDA is required to determine each manufacturer's and importer's market share by dividing the manufacturer's or importer's individual cigarette production volume by the "gross domestic volume from *all* sources" in domestic commerce.  *Id.* § 518d(i)(4)(B) (emphasis added).

5.     Calculating each manufacturer's or importer's assessment depends on knowing the total volume of tobacco products placed in the stream of commerce by all manufacturers and importers.  The statute demands both accuracy and fairness: "No manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume."  *Id.* § 518d(e)(2).

6.     To facilitate an accurate calculation, each manufacturer and importer is directed to provide the Secretary with copies of certain tax returns and customs forms showing its total volume of tobacco products placed into domestic commerce.  *Id.* § 518d(h).  Importantly, Congress did not permit USDA to rely solely on manufacturers' and importers' good faith and self-reporting.  Instead, the statute directs that the market share determination "shall be made by the Secretary based" not only on the information reported by manufacturers and importers but also on "any other relevant information provided to or obtained by the Secretary."  *Id.* § 518d(g)(1).

7.     In joint appeals before USDA, plaintiffs challenged two quarterly assessments imposed on RJRT and Santa Fe on grounds that the agency had required each of them to pay an assessment based on a share that is in excess of

their share of domestic volume.  In particular, USDA had underestimated gross domestic volume of cigarette production, causing the agency to overstate RJRT's and Santa Fe's respective market shares.

8.     To support their challenge, plaintiffs provided USDA with detailed relevant information on significant unreported production by rogue cigarette manufacturers.  The evidence showed, among other things, that non-reporting manufacturers in one state alone — New York — produce and introduce into commerce approximately 4 billion cigarettes per year.

9.     Plaintiffs also provided USDA with specific relevant information that the quarterly assessments imposed on RJRT and Santa Fe in September 2013 and December 2013 failed to account for at least two non-reporting, unlicensed Native American cigarette manufacturers based in New York — the Onondaga Nation Cigarette Factory ("Onondaga Nation") and T&D Enterprises.

10.    After a thorough investigation and based on relevant information provided to USDA in connection with their joint appeals, plaintiffs established that Onondaga Nation manufactures approximately 1 million cartons of cigarettes per year and sells a substantial portion of those cigarettes to non-Native Americans. Information obtained through plaintiffs' investigations initially established that T&D Enterprises produces approximately 2.5 million cartons of cigarettes per year and sells a substantial portion of those cigarettes to non-Native Americans.  After conducting additional investigations, plaintiffs later updated the information

provided to USDA and showed that T&D Enterprises produces approximately 6.5 million cartons of cigarettes per year.

11.    Neither Onondaga Nation nor T&D Enterprises reports its production volumes to USDA as required under FETRA.  Nor does either pay the excise taxes associated with those volumes.  Both manufacturers are unlicensed.

12.    Plaintiffs' uncontradicted evidence presented to USDA established that, by failing to account for Onondaga Nation's and T&D Enterprises' contributions to domestic cigarette volume, USDA over-assessed RJRT and Santa Fe by at least $119,004 and $6,543, respectively, in September 2013, and by at least $257,148 and $15,836, respectively, in December 2013.   Plaintiffs requested adjustments in those amounts.

13.    Alternatively, plaintiffs noted that they would have no objection to USDA adjusting the assessments based on a reasonable across-the-board estimate of all nationwide unreported cigarettes manufactured and introduced into commerce.

14.    In a March 27, 2014 letter ruling, USDA denied plaintiffs' joint appeals of both their quarterly assessments.

15.    USDA did not dispute that the evidence establishes that non-reporting cigarette manufacturers, including Onondaga Nation and T&D Enterprises, are responsible for a significant share of domestic cigarette volume.  Nor did it dispute that it failed to take those companies' production volumes into account in determining RJRT's and Santa Fe's respective assessments.

16.     Unreported production and sale of cigarettes is a widely recognized, notorious problem.  USDA cited no evidence that contradicts or conflicts with the relevant information provided by plaintiffs concerning Onondaga Nation and T&D Enterprises specifically or non-reporting cigarette manufacturers generally.  USDA did not dispute the existence of rogue cigarette manufacturing operations that fail to report their volume of sales, as required by law.  Nor did it dispute that the agency's failure to account for those unreported volumes of sales significantly inflates the putative market share of law-abiding cigarette manufacturers and importers, including plaintiffs.

17.     USDA nonetheless refused to consider plaintiffs' data in evaluating the accuracy of the challenged assessments.  It did so on the theory that plaintiffs' extensive evidence of unreported domestic cigarette production and introduction into interstate commerce was not "relevant for the purposes of" calculating "gross domestic volume from all sources" in domestic commerce.

18.     That determination was based on USDA's erroneous interpretation of FETRA.  According to USDA, the information concerning unreported production was not "relevant" within the meaning of FETRA because it had not yet been "substantiated by the U.S. Department of the Treasury, the U.S. Department of Homeland Security, or the U.S. Department of Justice (Bureau of Alcohol, Tobacco, and Firearms)."  The agency cited no statutory or other authority for imposing that limitation on evidence relevant to the assessments to be made by USDA in accordance with FETRA.

19.    USDA's interpretation of the statutory requirements is impermissible and unreasonable, and its willful blindness to non-reporting manufacturers is arbitrary and capricious, not in accordance with law, in excess of USDA's statutory jurisdiction and authority, and violates plaintiffs' statutory rights.  The failure to consider and make reasonable adjustments based on "relevant information" concerning gross domestic volume from all sources violates FETRA, as well as the requirement of reasoned decision-making under the Administrative Procedure Act ("APA").  And USDA's excessive assessments against RJRT and Santa Fe violate FETRA's prohibition on assessments in excess of market share and the APA.

20.    No matter how the government exercises its enforcement prerogatives against those who fail to pay their share of FETRA payments, USDA has no authority to saddle other manufacturers or importers with higher quarterly assessments to make up the difference.  The statute requires that USDA make appropriate adjustments to ensure that it accurately calculates the "gross domestic volume from all sources" in domestic commerce, 7 U.S.C. § 518d(i)(4)(B), and that "[n]o manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume," *id.* § 518d(e)(2).

21.    RJRT and Santa Fe are entitled to the assessment reductions that they sought and USDA denied.  USDA's decision denying plaintiffs' request for an assessment reduction should be struck down as arbitrary and capricious, not in accordance with law, in excess of USDA's statutory jurisdiction and authority, and

in violation of plaintiffs' statutory rights, and plaintiffs should be afforded any other relief to which they are entitled.

## PARTIES

22.     Plaintiff R.J. Reynolds Tobacco Company ("RJRT") is a North Carolina corporation with its corporate offices located in Winston-Salem, North Carolina, and its manufacturing operations located in Winston-Salem and Tobaccoville, North Carolina, respectively.  RJRT is the second largest tobacco manufacturer in the United States.  Its cigarettes are sold under the brand names Camel, Pall Mall, and Winston, among others.  RJRT is a wholly-owned subsidiary of Reynolds American, Inc. ("RAI")

23.     Plaintiff Santa Fe Natural Tobacco Company, Inc. ("Santa Fe") is a New Mexico corporation with its corporate offices located in Santa Fe, New Mexico and manufacturing operations located in Oxford, N.C.  Its cigarettes are sold under the brand name Natural American Spirit.  Santa Fe is a wholly-owned subsidiary of RAI.

24.     Defendant United States Department of Agriculture ("USDA") is a cabinet department of the United States government.  USDA's headquarters and principal place of business are located at 1400 Independence Avenue, SW, Washington, D.C. 20250.  Its governmental activities occur in the District of Columbia and nationwide.

25.     Defendant Tom Vilsack is the Secretary of USDA ("the Secretary").  He is sued solely in his official capacity.  Congress has charged the Secretary with

implementing FETRA.   His governmental activities occur in the District of Columbia and nationwide.

26.     Defendant Commodity Credit Corporation ("CCC") is an agency of USDA.  FETRA authorizes CCC, acting on behalf of the Secretary, to administer the Tobacco Trust Fund, levy quarterly assessments on tobacco product manufacturers and importers under FETRA, and adjudicate challenges to those assessments. 7 U.S.C. §§ 518e, 518d; 7 C.F.R. § 1463.11.  Its governmental activities occur in the District of Columbia and nationwide.

27.     Defendant Farm Service Agency ("FSA") is an agency of USDA and the parent agency of CCC.  Its governmental activities occur in the District of Columbia and nationwide.

28.     Defendant Juan M. Garcia is the Administrator of the FSA and Executive Vice President of CCC.  He is sued solely in his official capacity.  His governmental activities occur in the District of Columbia and nationwide.

## JURISDICTION AND VENUE

29.     This action arises under FETRA, 7 U.S.C. §§ 518 *et seq*., and the APA, 5 U.S.C. §§ 500 *et seq*.

30.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arises under federal law.

31.     This Court also has jurisdiction under 28 U.S.C. § 1361, which grants district courts "original jurisdiction of any action in the nature of mandamus to

compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff[s]."

32.     This Court also has jurisdiction under 7 U.S.C. § 518d(j)(1), which provides that "[a]ny manufacturer or importer aggrieved by a determination of the Secretary with respect to the amount of any assessment may seek review of the determination in the United States District Court for the District of Columbia or for the district in which the manufacturer or importer resides or has its principal place of business at any time following exhaustion of the administrative remedies available under subsection (i)."

33.     This Court may issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2202.

34.     There exists between plaintiffs and defendants an actual and justiciable controversy as to which resolution by this Court is required.

35.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because defendants reside in this district and a substantial part of the events or omissions giving rise to this action occurred in this district.

## STATUTORY AND REGULATORY BACKGROUND

### The Fair And Equitable Tobacco Reform Act

36.     In 2004, Congress enacted FETRA to end the system of quotas and other price supports for tobacco growers.  FETRA eases the transition by replacing the old system with the Tobacco Transition Payment Program, a temporary system

of periodic payments to tobacco growers and other holders of tobacco quotas.  *See* 7 U.S.C. §§ 518a & 518b.

37.    FETRA created the Tobacco Trust Fund to fund the transition payments.  The Trust Fund is administered by the CCC, an agency of USDA.

38.    The Tobacco Trust Fund is funded largely by assessments imposed on manufacturers and importers of tobacco products.  *Id.* § 518e.  FETRA requires CCC, acting on behalf of the Secretary, to impose assessments on "each tobacco product manufacturer and tobacco product importer that sells tobacco products in domestic commerce in the United States during [a] fiscal year."  *Id.* § 518d(b)(1).

39.    The quarterly assessments are governed by a specific formula designed to allocate Trust Fund costs *pro rata* among manufacturers and importers based on each entity's "market share."  *Id.* § 518d(a)(3).

40.    ***Class-by-Class Allocations.***    FETRA directs the Secretary to calculate the percentages of the total assessment to be paid collectively by manufacturers and importers of each class of tobacco product: cigarettes, cigars, snuff, roll-your-own tobacco, chewing tobacco, and pipe tobacco.  7 U.S.C. § 518d(c).  Those percentages must be based on "the share of gross domestic volume held by [each] class of tobacco product."  *Id.* § 518d(c)(2).

41.    For example, because it was calculated that cigarettes represent 88.499% of total tobacco sales from April 2013 through June 2013, cigarette manufacturers and importers were required collectively to contribute 88.499% of

11

the aggregate September 1, 2013 quarterly assessment for that period collected from all manufacturers and importers of the specified classes of tobacco products.

42. ***Individual Market Share.*** FETRA further directs the Secretary to determine each individual manufacturer's and importer's market share by dividing each individual manufacturer's and importer's sales volume by the gross domestic sales volume for each product class. *Id.* § 518d(a)(3) ("The term 'market share' means the share of each manufacturer or importer of a class of tobacco product (expressed as a decimal to the fourth place) of the total volume of domestic sales of the class of tobacco product during the base period for a fiscal year for an assessment under this section."); *see also id.* § 518d(a)(2)(A).

43. The numerator — individual sales volume — is to be calculated based on any and all relevant information available to the Secretary, including self-reports by manufacturers and importers. FETRA requires each manufacturer and importer to submit copies of any tobacco product federal excise tax returns and customs forms, and the Secretary has authority to assess a civil penalty for failure do so. *Id.* § 518d(h).

44. The denominator — total "volume of domestic sales" for each product class — is to be "calculated based on gross domestic volume." *Id.* § 518d(g)(2). The term "gross domestic volume" means all non-tax-exempt tobacco products that are "removed" into domestic commerce. *Id.* § 518d(a)(2)(A).

(a) The term "removed" as used in FETRA incorporates the definition from the Internal Revenue Code, which broadly includes any means of

placing tobacco products in the stream of commerce, whether by removing domestically manufactured products "from the factory," or by "releas[ing] [imported products] from customs custody," or even by employing unlawful means such as "smuggling."  26 U.S.C. § 5702(j).

(b)    Under the statute, "gross domestic volume" is not limited to sales reported under § 518d(h), but also includes sales that a manufacturer or importer fails to report in violation of FETRA.  *See* 7 U.S.C. § 518d(i)(4)(B) (market share must be based on "gross domestic volume from all sources").

(c)    An underestimated gross domestic volume, if uncorrected, will necessarily result in overstating the market share for all individual manufacturers and importers that have reported in compliance with FETRA.

45.    A larger individual market share results in a larger quarterly assessment.

46.    Based on the determinations of individual market shares and class-by-class allocations, the Secretary calculates quarterly assessments "by multiplying (1) the market share of the manufacturer or importer, as calculated with respect to that payment period, of the class of tobacco product; by (2) the total amount of the assessment for that quarterly payment period . . . for the class of tobacco product." *Id.* § 518d(f).

47.    Volumes of cigarettes and cigars are measured in sticks.    *Id.* § 518d(g)(3).

48.     FETRA requires the Secretary to use "any relevant information" provided to or obtained by him in the calculation of both individual sales volume and gross domestic volume (the two components of market share) to ensure that each manufacturer's and importer's quarterly assessment is proportionate to its market share.  *Id.* § 518d(g)(1).

49.     The statute forbids overcharges.  It provides that "[n]o manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume."  *Id.* § 518d(e)(2).

50.     ***Challenges to Quarterly Assessments.***  The Secretary is required to calculate accurately total gross domestic volume of cigarettes and to revise a quarterly assessment shown to be in error.  FETRA and its implementing regulations establish a procedure for challenging assessment errors.

(a)     A manufacturer or importer may contest its assessment by filing an appeal with the Secretary.  *Id.* § 518d(i).  "In challenging the assessment, the manufacturer or importer may use any information that is available, including third party data on industry or individual company sales volumes."  *Id.* § 518d(i)(2); *see also* 7 C.F.R. § 1463.11(b).

(b)     After receiving notice of a manufacturer's or importer's challenge of an assessment, the Secretary has 30 days to "decide whether the information provided to the Secretary . . . and any other information that the Secretary determines is appropriate, is sufficient to establish the original

14

assessment was incorrect; and . . . make any revisions necessary to ensure that each manufacturer and importer pays only its correct pro rata share of [the] total gross domestic volume from all sources." 7 U.S.C. § 518d(i)(4)(A), (B).

(c)     After conducting that review, the Secretary "shall revise the amount of the assessment so that the manufacturer or importer is required to pay only the amount correctly determined." *Id.* § 518d(i)(3) (emphasis added).

51.    Native American cigarette manufacturers are not exempt from FETRA.  They are required by law both to provide the documentation required by § 518d(h) and to pay their share of tobacco transition assessments each quarter. But regardless of whether Native American manufacturers actually remit the taxes they owe, USDA is required to include their production output in its calculation of the total volume of tobacco products, which ensures that no manufacturer or importer pays more than its proportional share.

52.    In the past, USDA has recognized its statutory duty to revise erroneous assessments when presented with "relevant information" beyond excise tax and customs documents.

53.    In February 2006, the Secretary fulfilled his obligation to reduce RJRT's assessment when CCC failed to account for non-reporting companies in determining quarterly assessments.

54.    In its February 7, 2006 letter ruling, USDA acknowledged that its failure to account for the non-reporting companies caused it to overcharge both RJRT and Lorillard Tobacco Company.  It therefore adjusted RJRT's and Lorillard's

assessments, despite CCC's lack of information about production and excise tax information for the non-reporting companies.

**Federal Food, Drug and Cosmetic Act**

55.     In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act, which incorporated the FETRA assessment methodology into a separate regulatory regime under the Federal Food Drug, and Cosmetic Act ("FDCA").

56.     The FDCA generally adopts the FETRA methodology to determine the "user fee" to be paid by each manufacturer or importer of regulated tobacco products to the Food and Drug Administration ("FDA") to fund the exercise of its newly conferred jurisdiction to regulate tobacco products.     Pub. L. No. 111-31, § 919(b)(2)(B)(ii), 123 Stat. 1776, 1826-30 (2009) (codified at 21 U.S.C. § 387s(b)(2)(B)(ii)).

57.     Section 919 of the FDCA provides that FDA must assess and collect user fees from "each manufacturer and importer of tobacco products" subject to the statute.  21 U.S.C. § 387s(a).

58.     The statute sets a fixed total amount to be assessed and collected from FDA-regulated tobacco product manufacturers and importers for each fiscal year (*e.g.*, for fiscal year 2014, $534 million).  *Id.* § 387s(b)(1).  That total amount is then apportioned among certain classes of tobacco products, including cigarettes, using each class's "applicable percentage" of the total tobacco market.  *Id.* § 387s(b)(2)(A). Each class's share, in turn, is allocated to manufacturers and importers of that class

of products in accordance with their respective "percentage share" of the market. *Id.* § 387s(b)(3)–(4).

59.    At least through fiscal year 2014, the applicable percentage for assessing user fees on the classes of tobacco products set forth in Section 919 is determined by reference to FETRA. *See* 21 U.S.C. § 387s(b)(2)(B)(ii). The market share figures that determine the amount of user fees assessed under the FDCA against each manufacturer and importer of FDA-regulated tobacco products are the market share figures determined by USDA under FETRA (with minor variations not relevant to this action).

**Licensing, Reporting, and Taxation of Cigarette Production and Sales**

60.    Under federal law, cigarette manufacturers are supposed to obtain an operating permit from the U.S. Alcohol and Tobacco Tax and Trade Bureau ("TTB").

61.    The federal government and all 50 States (and the District of Columbia) impose excise taxes on the sale of cigarettes. In addition, many local governments impose additional excise taxes on the sale of cigarettes.

62.    Federal excise taxes on tobacco products are levied directly on "the manufacturer or importer of tobacco products." U.S. cigarette manufacturers incur federal excise tax liability when cigarettes are "removed" from the manufacturer's facilities. 26 U.S.C. §§ 5701–5703.

63.    Federal excise tax collection depends on accurate self-reporting by manufacturers and importers to TTB. Federal law requires manufacturers and importers to file an Excise Tax Return (TTB Form 5000.24) with TTB, reporting

cigarette removals in the covered period, and with it, they make the required tax payment.

64.     Unlicensed cigarette manufacturers — that is, those operating without a TTB permit — evade federal excise tax liability.  A licensed manufacturer's underreporting (or failure to report) cigarettes produced and removed from its factory also results in evasion of federal excise taxes.

65.     FETRA requires cigarette manufacturers and importers to provide USDA with copies of their Excise Tax Returns on the date "those returns or forms are filed, or required to be filed, with [TTB]."  7 U.S.C. § 518d(h)(1).

66.     Collection of state and local excise taxes on tobacco products also depends on self-reporting.  Generally, state and local excise taxes are paid by wholesalers or distributors through the purchase of excise tax stamps from state and/or local taxing jurisdictions.  Failure to purchase the required excise tax stamps results in evasion of state and/or local excise taxes.

67.     Federal excise tax laws apply to virtually all cigarettes manufactured and sold in the United States, including cigarettes manufactured by Native American tribes and sold outside a Native American reservation or to a purchaser who is not a reservation member.  Only cigarettes sold on a Native American reservation to reservation members are exempt from federal excise taxes.

68.     State sales and excise tax laws also generally apply to cigarettes manufactured by Native American tribes and sold outside a Native American reservation or to a purchaser who is not a reservation member.  Only cigarettes sold

on a Native American reservation to reservation members are exempt from state sales and excise tax laws.

## GENERAL ALLEGATIONS

### Non-Reporting Cigarette Manufacturers

69.    The unreported manufacturing of cigarettes, distributed and sold tax-free in violation of state and federal law, is a multi-billion dollar business in the United States.

70.    A 2007 report prepared by staff for the U.S. House Committee on Homeland Security estimated the annual domestic cigarette market at 414 billion sticks.  Of that number, 5%, or approximately 20 billion cigarettes, were unreported and untaxed.

71.    In 2011, the Government Accountability Office ("GAO") prepared a report on illicit tobacco manufacturing, entitled GAO Report: Illicit Tobacco – Various Schemes Are Used to Evade Taxes and Fees (GAO-11-313), 2011ARD 047-9, (Mar. 8, 2011).   According to that report, there are "two primary illicit manufacturing schemes used to evade taxes on domestically produced cigarettes."

(a)    *Unlicensed manufacturing* is production by manufacturers that have no TTB permit and consequently do not report any production to government authorities.

(b)    *Underreporting production* is the submission of false excise tax returns by licensed manufacturers.  Because excise taxes are assessed based on volume, underreporting the number of cigarettes that leave a manufacturing facility results in tax evasion.

72.    Non-reporting manufacturers cost state and federal governments large sums in lost tax revenue.  A 2009 report by the Inspector General of the U.S. Department of Justice estimates that tobacco diversion costs the federal and state governments over $5 billion in revenue from unpaid excise taxes each year.

73.    According to the 2011 GAO report, most unlicensed cigarette manufacturing occurs in northern New York among an estimated 15 to 18 unlicensed cigarette manufacturers, operating on land controlled by the St. Regis Mohawk tribe.    Those manufacturers alone have cost New York State approximately $1 billion in lost tax revenues per year.

74.    Unreported cigarette manufacturing by Native American tribes has been on the rise in response to recent court approval of New York's renewed effort to enforce its tobacco excise tax.

(a)    A 2011 decision by the U.S. Court of Appeals for the Second Circuit, reported at *Oneida Nation of New York v. Cuomo*, 645 F.3d 154 (2d Cir. 2011), held that the state of New York has authority to collect state excise taxes on tobacco products sold on Native American reservations to non-reservation members.

(b)    According to a *New York Times* article published on February 22, 2012, the tribes responded to the decision by "stop … buy[ing] the name-brand cigarettes" and "resolv[ing] instead to stock the shelves of their convenience stores with their own cigarettes."

(c)    The Mackinac Center for Public Policy estimates that 61% of cigarette sales in the state of New York are illicit.

75.     Non-reporting Native American cigarette manufacturers and tobacco retail shops sell cigarettes in substantial volumes to non-reservation members.

(a)     In 2013, for example, a Brooklyn federal judge ordered three Indian smoke shops linked to the Poospatuck Reservation to pay New York $10 million for trafficking untaxed cigarettes to non-reservation members.   Each member of the Poospatuck Reservation would have had to smoke 960 packs a day to reach the number of cigarettes that were being sold on the reservation before the lawsuit.

(b)     Another report prepared by the Tobacco Control Legal Consortium estimates that "the number of cigarettes imported by some tribes would be enough for every reservation resident, including children and infants, to smoke hundreds of packs a day.   For example, a tiny Long Island reservation with 283 residents imported 90 million cigarettes in 2000 and more than 2 billion in 2007."

(c)     In *Oneida*, the U.S. Court of Appeals for the Second Circuit recognized that "non-[reservation] member evasion of the [New York state] cigarette tax [has] proliferated."   The court noted that based on cigarette sales by the Unkechauge Nation, "[i]f only Unkechauge members had consumed these cigarettes, every man, woman, and child would have smoked 364 packs per day in 2009." 645 F.3d at 159.

76.     Due to the lack of visibility into unlicensed and non-reporting cigarette manufacturing, plaintiffs retained GlobalSource LLC, a respected business investigations firm, to investigate the illicit cigarette market.   Beginning in 2012,

GlobalSource conducted a rigorous investigation and survey of the production and distribution of untaxed cigarettes in New York State.

77.   RAI Services Company ("RAIS") is a wholly-owned subsidiary of RAI that bears primary responsibility for coordinating regulatory compliance activities for RAI's operating companies, including RJRT, Santa Fe, and American Snuff Company, LLC ("ASC").  On January 15, 2013, RAIS, on behalf of RJRT, Santa Fe, and ASC, sent a letter to FDA's Center for Tobacco Products ("CTP") and Office of Chief Counsel requesting a meeting to discuss FDA's December 1, 2012 user fee assessment on RJRT, Santa Fe, and ASC.  Plaintiffs believed that CTP's December 1, 2012 assessments and prior quarterly user fee assessments were in excess of their respective percentage shares of the cigarette and smokeless tobacco markets because several cigarette manufacturers in New York State were being excluded from the cigarette market share calculation.

78.   On February 6, 2013, plaintiffs made a presentation to CTP concerning the calculation of user fees under the FDCA.  Plaintiffs noted that reported decline in consumer demand for cigarettes did not coincide with reported decline of sales volume of cigarettes in New York.

79.   The gap between consumer demand for cigarettes and New York sales volume of cigarettes is attributable to non-reporting manufacturers.

80.   Based on the gap in New York State between consumer demand and reported volumes, plaintiffs calculated that the gap in volume constitutes between 2.6 billion and 4 billion sticks per year, representing between 0.9% and 1.4% of the

total U.S. cigarette industry volume.  In other words, non-reporting manufacturers in New York State alone are responsible for as much as 1.4% of U.S. cigarette industry volume.

81.    The foregoing information, as well as other relevant information, was provided to USDA and is part of the administrative record.

**September 2013 Excessive Assessment**

82.    On September 1, 2013, USDA issued its assessments under FETRA to RJRT and Santa Fe for the second-quarter assessment period.  RJRT's quarterly assessment was $49,073,232.70;  Santa Fe's quarterly assessment was $2,745,891.45.

83.    The assessments were based on RJRT's and Santa Fe's respective market shares of the total gross domestic volume of cigarettes in the assessment period, as calculated by USDA.

84.    On September 30, 2013, RJRT and Santa Fe paid the total amounts of USDA's September 1, 2013 assessments, but disputed $119,004.92 of RJRT's quarterly assessment and $6,543.83 of Santa Fe's quarterly assessment.

85.    Specifically, on September 30, 2013, RJRT and Santa Fe both filed a Tobacco Transition Assessment Program ("TTAP") Dispute Information Quarterly Assessment form detailing the amount of the quarterly assessment in dispute and requesting that the amount in dispute be placed in escrow pursuant to 7 U.S.C. § 518d(i)(5) until each company's challenge is resolved.  RJRT and Santa Fe requested $119,004.92 and $6,543.83 of the company's quarterly assessment, respectively, be placed in escrow.

86.    On September 30, 2013, RJRT and Santa Fe notified USDA of each company's challenge to USDA's September 2013 quarterly FETRA assessment.

87.    Plaintiffs undertook a thorough investigation and review in determining the percentage of each assessment to dispute.  Initially, plaintiffs obtained relevant information from FDA in response to Freedom of Information Act requests and other third-party data on non-reporting manufacturers.  It established that multiple Native American cigarette manufacturers were not complying with FETRA's requirements, and that USDA charged both RJRT and Santa Fe an assessment that was in excess of each company's pro rata share of gross domestic volume.  Relevant information showed that USDA failed to account for cigarette production by Onondaga Nation and T&D Enterprises in calculating the September 2013 assessments.

88.    Plaintiffs calculated an adjusted total quarterly gross domestic volume for the payment period for the cigarette class to include the unaccounted volume of cigarettes of the non-compliant Native American manufacturers.

89.    To calculate the adjusted quarterly gross domestic volume for the cigarette class, plaintiffs determined the quarterly volume of domestic sales of cigarettes for both T&D Enterprises and Onondaga Nation.  As alleged in more detail below, GlobalSource conservatively estimated that T&D Enterprises manufactured approximately 500,000,000 cigarettes per year (200 cigarettes per carton multiplied by 2,500,000 cartons) and that Onondaga Nation manufactured approximately 218,400,000 cigarettes per year (200 cigarettes per carton multiplied

by 1,092,000 cartons).  (*See* Exhibit A for this calculation and the calculations detailed in paragraphs 90-99.)

90.     The quarterly volume of sales, calculated by dividing each company's annual volume of cigarettes by four, is thus 125,000,000 cigarettes for T&D Enterprises and 54,600,000 cigarettes for Onondaga Nation (a combined total of 179,600,000 cigarettes).   (In December 2013, GlobalSource revised its initial findings concerning T&D Enterprises.  Based on a reliable source with knowledge of T&D Enterprises' operations, GlobalSource concluded that T&D Enterprises manufactures approximately 1,287,000,000 cigarettes per year.   This revised estimate indicates that GlobalSource's initial estimates were conservative.)

91.     Because USDA bases its measurement of gross domestic volume measurements on the total gross excise taxes paid during the relevant payment period (specifically, April 2013 through June 2013 for this challenge) for each class of tobacco product, plaintiffs determined the total amount of excise taxes that both T&D Enterprises and Onondaga Nation should have paid during the payment period based on the companies' estimated quarterly volume of cigarette sales. Plaintiffs then multiplied the combined total of T&D Enterprises' and Onondaga Nation's quarterly volume of cigarette sales (179,600,000 cigarettes) by the 2013 federal excise tax rate ($50.33/1000 sticks).

92.     This calculation showed that T&D Enterprises and Onondaga Nation should have paid an estimated $9,039,268 in federal excise taxes during the payment period.

93.    To compute the adjusted gross domestic volume for the cigarette class to account for T&D Enterprises and Onondaga Nation, plaintiffs added the estimated excise tax that T&D Enterprises and Onondaga Nation should have paid during the payment period ($9,039,268) to the total reported gross excise taxes paid during the payment period for the cigarette class.  According to USDA's September 1, 2013 quarterly assessment notification, the total reported gross excise taxes paid during the payment period by reporting manufacturers and importers for the cigarette class was $3,716,824,161.00.

94.    This calculation showed that the adjusted gross domestic volume (as measured by the total gross excise tax that should have been paid) for the cigarette class for this payment period is $3,725,863,429.00.

95.    To calculate RJRT's and Santa Fe's respective market shares of the adjusted gross domestic volume for the cigarette class to account for T&D Enterprises and Onondaga Nation, plaintiffs divided the total gross excise taxes paid by each plaintiff during the payment period by the adjusted gross excise taxes for the cigarette class.

96.    To determine the amount of the quarterly assessment for the cigarette class that each manufacturer or importer should pay, USDA multiplies the market share of each manufacturer or importer by the total amount of the assessment for the quarterly payment period for each class of tobacco product.  According to USDA's September 1, 2013 quarterly assessment notification, the total quarterly assessment for the cigarette class for the payment period was $211,645,710.66.

97.   The total quarterly assessment for each manufacturer and importer includes both the manufacturer's or importer's market share of the total program costs and market share of the total interest costs of the program.   According to USDA's September 1, 2013 quarterly assessment notification, the program costs for the cigarette class amounted to $211,512,610.00 and the interest costs for the cigarette class amounted to $133,100.66.

98.   To determine RJRT's and Santa Fe's adjusted quarterly assessments to account for T&D Enterprises and Onondaga Nation, plaintiffs multiplied the total program costs by each company's adjusted market share, and the total interest costs by each company's adjusted market share.   The difference between RJRT's and Santa Fe's adjusted quarterly assessments and RJRT's and Santa Fe's actual quarterly assessments is $119,004.92 and $6,543.83, respectively.

99.   By failing to account for T&D Enterprises and Onondaga Nation, USDA assessed RJRT at least $119,004.92 and Santa Fe at least $6,543.83 in excess of their actual market share of the total amount of the assessment for the relevant payment period for the cigarette class.

100.   The foregoing information, as well as other relevant information, was provided to USDA and is part of the administrative record.

**December 2013 Excessive Assessment**

101.   On December 1, 2013, USDA issued quarterly assessments under FETRA to RJRT and Santa Fe for the third-quarter assessment period.   RJRT's quarterly assessment was $49,301,795.80.   Santa Fe's quarterly assessment was $3,069,579.96.

102.   The assessments were based on RJRT's and Santa Fe's respective market shares of the total gross domestic volume for cigarettes for the assessment period, as calculated by USDA.

103.   On December 31, 2013, RJRT and Santa Fe each paid the total amount of USDA's December 1, 2013 assessment but disputed $257,148.50 of RJRT's quarterly assessment and $15,836.10 of Santa Fe's quarterly assessment.

104.   On December 31, 2013, RJRT and Santa Fe each filed a TTAP Dispute Information Quarterly Assessment form detailing the amount of the quarterly assessments in dispute and requesting the amount in dispute be placed in escrow pursuant to 7 U.S.C. § 518d(i)(5) until each company's challenge is resolved.   RJRT and Santa Fe requested $257,148.50 and $15,386.10 of each company's quarterly assessment, respectively, be placed in escrow until their challenge to the December 1, 2013 assessment is resolved.   The amount placed in escrow represents the amount each company believes it was assessed in excess of its actual market share for the assessment period.

105.   On December 31, 2013, plaintiffs notified USDA of each company's challenge to USDA's December 1, 2013 FETRA assessment.

106.   Plaintiffs undertook a thorough investigation and review in determining the percentage of each assessment to dispute.   Plaintiffs initially obtained relevant information from FDA in response to Freedom of Information Act requests and other third-party data on non-reporting manufacturers establishing that multiple Native American cigarette manufacturers are not complying with FETRA's requirements and that USDA charged both RJRT and Santa Fe an assessment that was in excess of each company's pro rata share of gross domestic volume.   Relevant information specifically showed that USDA failed to account for cigarette production by Onondaga Nation and T&D Enterprises in calculating the December 2013 assessments.

107.   Plaintiffs therefore alleged that USDA improperly omitted Onondaga Nation and T&D Enterprises from the December 1, 2013 assessments.

108.   As alleged above, plaintiffs calculated an adjusted total quarterly gross domestic volume for the payment period for the cigarette class to include the uncounted volume of cigarettes of the non-compliant Native American manufacturers.

109.   To calculate the adjusted quarterly gross domestic volume for the cigarette class, plaintiffs determined the quarterly volume of domestic sales of cigarettes for both T&D Enterprises and Onondaga Nation.   As alleged in more detail below, GlobalSource conservatively estimated that T&D Enterprises manufactures approximately 1,287,000,000 cigarettes per year (200 cigarettes per carton multiplied by 6,435,000 cartons) and that Onondaga Nation manufactures

approximately 218,400,000 cigarettes per year (200 cigarettes per carton multiplied by 1,092,000 cartons).  The quarterly volume of sales, calculated by dividing each company's annual volume of cigarettes by four, is thus 321,750,000 cigarettes for T&D Enterprises and 54,600,000 cigarettes for Onondaga Nation (a combined total of 376,350,000 cigarettes).  (*See* Exhibit B for this calculation and the calculations detailed in paragraphs 110-118.)

110.   Because USDA bases its measurement of gross domestic volume measurements on the total gross excise taxes paid during the relevant payment period (specifically, July 2013 through September 2013 for this challenge) for each class of tobacco, plaintiffs determined the total amount of excise taxes that both T&D Enterprises and Onondaga Nation should have paid during the payment period based on the companies' estimated quarterly volume of cigarette sales. Plaintiffs then multiplied the combined total of T&D Enterprises' and Onondaga Nation's quarterly volume of cigarette sales (376,350,000 cigarettes) by the 2013 federal excise tax rate ($50.33/1000 sticks).

111.   These calculations showed that T&D Enterprises and Onondaga Nation should have paid an estimated $18,941,695.50 in federal excise taxes during the payment period.

112.   To compute the adjusted gross domestic volume for the cigarette class to account for T&D Enterprises and Onondaga Nation, plaintiffs added the estimated excise tax that T&D Enterprises and Onondaga Nation should have paid during the payment period ($18,941,695.50) to the total reported gross excise taxes

paid during the payment period for the cigarette class. According to USDA's December 1, 2013 quarterly assessment notification, the total reported gross excise taxes paid during the payment period by reporting manufacturers and importers for the cigarette class was $3,611,879,968.00.

113. This calculation showed that the adjusted gross domestic volume (as measured by the total gross excise tax that should have been paid) for the cigarette class for this payment period is $3,630,821,663.50.

114. To calculate RJRT's and Santa Fe's market share of the adjusted gross domestic volume for the cigarette class to account for T&D Enterprises and Onondaga Nation, plaintiffs divided the total gross excise taxes paid by each company during the payment period by the adjusted gross excise taxes for the cigarette class.

115. To determine the amount of the quarterly assessment for the cigarette class that each manufacturer or importer should pay, USDA multiplies the market share of each manufacturer or importer by the total amount of the assessment for the quarterly payment period for each class of tobacco product. According to USDA's December 1, 2013 quarterly assessment notification, the total quarterly assessment for the cigarette class for the payment period was $211,578,436.95.

116. The total quarterly assessment for each manufacturer and importer includes both the manufacturer's or importer's market share of the total program costs and market share of the total interest costs of the program. According to USDA's December 1, 2013 quarterly assessment notification, the program costs for

the cigarette class amounted to $211,512,610.00 and the interest costs for the cigarette class amounted to $65,826.95.

117.   To determine RJRT's and Santa Fe's adjusted quarterly assessment to account for T&D Enterprises and Onondaga Nation, plaintiffs multiplied the total program costs by each company's adjusted market share, and the total interest costs by each company's adjusted market share.   The difference between RJRT's and Santa Fe's adjusted quarterly assessment and RJRT's and Santa Fe's actual quarterly assessment is $257,148.50 and $15,836.10, respectively.

118.   By failing to account for T&D Enterprises and Onondaga Nation, USDA assessed RJRT at least $257,148.50 and Santa Fe at least $15,836.10 in excess of their respective actual market share of the total amount of the assessment for the relevant payment period for the cigarette class.

119.   The foregoing information, as well as other relevant information, was provided to USDA and is part of the administrative record.

**Joint Appeals of September 2013 and December 2013 Assessments**

120.   On November 15, 2013, CCC responded to plaintiffs' challenge to the September 1, 2013 quarterly assessments.   CCC determined that "no revisions are warranted to [RJRT's and Santa Fe's] assessment of September 1, 2013" because the challenge did not "allege that CCC has miscalculated the assessment as a function of the tax and custom forms it has received . . . .   The allegation that [plaintiffs] raise[d] as a basis for [their] appeal is an allegation of tax evasion."

121.   On December 9, 2013, plaintiffs appealed CCC's determination and requested a hearing to provide evidence and testimony establishing that the

32

determination was erroneous, arbitrary and capricious, and not in accordance with law.

122.   The hearing was scheduled for February 26, 2014.

123.   Although CCC did not directly respond to plaintiffs' December 31, 2013 challenge, because the December 31, 2013 challenge included the same allegations as the September 30, 2013 challenge, USDA and plaintiffs agreed to combine the challenges at the February 26, 2014 hearing because USDA stated that it would deny the December 31, 2013 challenge on the same grounds as the September 30, 2013 challenge.

124.   On February 19, 2014, in advance of the February 26, 2014 hearing, plaintiffs submitted documents supporting a reduction in RJRT's and Santa Fe's respective quarterly assessments, including a letter brief and the direct testimony of two witnesses that plaintiffs intended to present at the hearing.  Steve Gentry, Senior Director of Regulatory Taxes for plaintiffs, provided direct testimony regarding the calculations behind plaintiffs' challenged assessment amounts for September and December 2013.  Richard Hynes, case manager for GlobalSource, provided a declaration with testimony on GlobalSource's investigation of cigarette manufacturers in New York State that do not report their sales volumes to USDA or pay the taxes or fees associated with those volumes.  On March 11, 2014, supplemental declarations were submitted to USDA because the September and December challenges were combined at the hearing.

125.   USDA informed plaintiffs that it did not intend to cross-examine either of plaintiffs' witnesses.  The testimony of those two witnesses was never challenged by USDA.

126.   In their letter brief, plaintiffs explained that USDA has jurisdiction to reduce RJRT's and Santa Fe's September 1, 2013 assessments because USDA is required to calculate gross domestic volume based on tax information provided by the manufacturers and importers, as well as "any other relevant information provided to or obtained by the Secretary."  7 U.S.C. § 518d(g)(1).

127.   In both their September and December 2013 challenges, plaintiffs provided USDA with relevant information that demonstrates USDA's calculation of gross domestic volume was erroneous because USDA failed to include certain non-reporting manufacturers in the gross domestic volume calculation.  Specifically, USDA failed to account for the contribution of at least two non-reporting cigarette manufacturers, Onondaga Nation and T&D Enterprises, to gross domestic volume of cigarette sales.

128.   The foregoing information, as well as other relevant information, was provided to USDA and is part of the administrative record.

**Plaintiffs' Evidence of Unreported Production**

129.   In challenging both the September and December 2013 assessments, plaintiffs provided USDA with extensive relevant information demonstrating that Onondaga Nation and T&D Enterprises manufacture and sell cigarettes and do not comply with FETRA.

130.   Plaintiffs provided USDA with relevant information that they had obtained from FDA in response to Freedom of Information Act requests for a list of manufacturers and importers assessed user fees.   Among other cigarette manufacturers, neither Onondaga Nation nor T&D Enterprises has been assessed a user fee by FDA for fiscal years 2013 or 2014.   As noted above, because at least through fiscal year 2014, the market share figures that determine the amount of user fees assessed under the FDCA are the market share figures determined by USDA under FETRA, manufacturers and importers of tobacco products that are excluded from FDA's user fee assessment must have been improperly omitted from USDA's calculation of the pro rata share of each manufacturer's or importer's gross domestic volume.

131.   Plaintiffs also provided USDA with relevant information that plaintiffs received from GlobalSource.   GlobalSource investigators use a number of accepted investigational methods to gather information, including on-the-ground and aerial surveillance, visiting retailers, conducting interviews, and utilizing confidential sources.

132.   GlobalSource has been investigating the tobacco industry worldwide for approximately 10 years and has been researching and investigating unreported tobacco sales/non-reporting tobacco product manufacturers in New York for approximately seven years.

133.    Law enforcement and regulatory agencies have routinely relied on information developed in GlobalSource's investigations to initiate enforcement action or as a lead for further investigation resulting in civil or criminal action.

134.    GlobalSource's extensive monitoring of the illicit market has made it uniquely qualified to estimate production levels of, and sales from, unlicensed cigarette factories.  GlobalSource has developed an expertise in evaluating illicit cigarette manufacturing operations and is able to assess a factory's level of activity through consultation with sources, analysis of public record, and observation of the factory and its distribution networks.  For example, GlobalSource has determined that a reasonably accurate way to estimate a factory's level of production is to identify the number of personally owned vehicles parked outside the factory; the type of cigarette manufacturing and packing equipment on site; the number of shifts the factory is operating; and the extent of its distribution network.

135.    GlobalSource also relies on publicly available studies.  It uses the Erie-Niagara Tobacco Use Survey and Roswell Park Memorial Institute Pricing Survey to monitor the price, sales activity of, and consumer preference for, Native American cigarette brands.  It also relies on publicly available reports, including the Mackinac Center for Public Policy, "Cigarette Taxes and Smuggling: A Statistical Analysis and Historical Review"; John Dunham and Associates, "An Examination of Cigarette Sales in New York State By Source: 2011"; GAO, "Illicit Tobacco: Various Schemes Are Used to Evade Taxes and Fees" (GAO-11-313); and GAO, "Internet Cigarette Sales: Giving ATF Investigative Authority May Improve Reporting and

Enforcement" (GAO-02-743).   In addition, GlobalSource obtains and analyzes publicly available New York cigarette tax data as part of its research.

136.   In 2012, plaintiffs hired GlobalSource to conduct a survey of the illicit cigarette market in New York State, including investigating tax differential smuggling and the production and distribution of untaxed cigarettes.

137.   After GlobalSource provided plaintiffs with a summary and briefing on its survey of the illicit cigarette market in New York State, plaintiffs asked GlobalSource to select two significant illicit cigarette manufacturers and conduct additional investigative work to assess their activity levels to support plaintiffs' challenge to USDA's quarterly FETRA assessment.   Plaintiffs and GlobalSource identified Onondaga Nation and T&D Enterprises as targets of the investigation.

138.   Plaintiffs and GlobalSource selected Onondaga Nation for several reasons.

(a)   Onondaga Nation did not have a historical record of previous cigarette manufacturing.   Any information that GlobalSource was able to gather would be useful not only to plaintiffs but also to federal agencies.

(b)   The Onondaga Nation factory is far enough from the Canadian border that it is very unlikely that any significant volume of its cigarettes is sold outside the United States.

(c)   When it began to manufacture cigarettes, Onondaga Nation was the focus of several news articles.   In a February 22, 2012 article on the proliferation of Native American cigarette manufacturing, the *New York Times*

reported that "the Onondaga Nation, with territory near Syracuse, [was] also considering establishing its own manufacturing operation." According to an August 31, 2012 *Syracuse Post-Standard* article, Onondaga Nation will "roll its own," and Onondaga Nation planned to begin its manufacturing operations and to start selling cigarettes in a month or two. While the brand was still in development, the article noted that the tribe was giving away free packs of Eagles brand cigarettes with each purchase of a carton of any other brand of cigarettes. According to the article, "the Onondagas have not applied for permits from the federal government required of tobacco manufacturers" because, according to tribal leader Sid Hill, "We're a sovereign nation." The *Albany Times-Union* reported in a November 11, 2013 article that relied heavily on sources of federal law enforcement officials that the Onondaga Nation factory was among a number of unlicensed factories operating in New York State. The tribe's lawyer told the newspaper that his client was in talks with federal officials.

139.    GlobalSource selected T&D Enterprises for similar reasons, including the wide distribution of its cigarettes to various Native American reservations. In addition, T&D Enterprises openly advertises its brands off the reservation.

140.    The foregoing information, as well as other relevant information, was provided to USDA and is part of the administrative record.

**Unreported Cigarette Manufacturing by Onondaga Nation**

141.    To conduct its investigation of Onondaga Nation, GlobalSource researched public records; conducted targeted surveillance (including on-the-ground surveillance) of Onondaga Nation; consulted confidential sources and others

knowledgeable of the factory's operations; performed in-person and telephone interviews; conducted surveys of cigarette shops in New York, Wisconsin, North Carolina, and Nebraska; and purchased product samples.

142.   GlobalSource's investigation confirmed that Onondaga Nation is an unlicensed cigarette manufacturer located on State Route 11 in Nedrow, New York.

143.   Onondaga Nation's cigarette factory has likely been in operation since August 2012.

144.   Onondaga Nation manufactures and distributes Eagles brand cigarettes.  Eagles brand cigarettes are available in several varieties, including King and 100s sized regular and menthol, full flavor, and "light" cigarettes.

145.   Under the FDCA, labeling or advertisements for a tobacco product that use the descriptors "light," "mild," or similar descriptors are prohibited unless a Modified Risk Tobacco Product order issued under Section 911(g) is effective.   21 U.S.C. § 387k(b)(2).   No such order applies to the tobacco products manufactured and distributed by Onondaga Nation.

146.   For a total of seven days in May, June, and July 2013, GlobalSource investigators conducted on-the-ground surveillance of Onondaga Nation's cigarette factory.  Based on the surveillance and other sources, GlobalSource  concluded that:

- Onondaga Nation's factory is approximately 18,725 square feet (107 feet wide by 175 feet long).  A portion of the front of the factory appears to house tribe offices and security;

- Onondaga Nation operates a single shift, approximately 7 hours per day, 5 days per week;

- Onondaga Nation employs approximately 8 to 12 employees (based on the number of personally owned vehicles observed in the parking lot);

- Onondaga Nation maintains two production lines at the factory; and

- Onondaga Nation is likely using a Molins Mk 8 machine (which produces an average of 2,000 sticks per minute).

147.    On July 10, 2013, packing equipment for Onondaga Nation arrived at the Port of Norfolk, Virginia.  The packing equipment was shipped from Alpha & Z Ltd. of HosKovo, Bulgaria to WB Packaging Consulting of Charles City.  Based on GlobalSource's understanding of the shipping manifest, GlobalSource concluded the equipment was a Molins hard line packer used to pack cigarettes into a hinged-lid hard pack.

148.    Based on GlobalSource's experience and the relevant information obtained from its surveillance of the Onondaga Nation cigarette factory, GlobalSource estimated that Onondaga Nation manufactures roughly 350 cases of 60 cartons each per week, or 1,092,000 cartons per year.

149.    Eagles brand cigarettes are available for purchase at Onondaga Nation Smoke Shop.  A GlobalSource investigator observed Eagles brand cigarettes prominently displayed in the store, occupying approximately five sections, or "walls," of shelving.  All shelves were fully stocked with Eagles brand cigarettes.

150.    Based on observations of the store, it appears that Onondaga Nation Smoke Shop displays roughly 3,200 cartons of Eagles brand cigarettes at one time.

151.    GlobalSource investigators took a video recording of customers visiting the store.  In approximately five minutes, the investigator counted 15 customers entering the store and 18 customers leaving the store, typically with one or more cartons of cigarettes.  GlobalSource investigators purchased several cartons of

Eagles brand cigarettes. The Eagles cigarettes did bear the proper tax stamp, manufacturer's mark, or federal license number.

152. GlobalSource prepared a report summarizing its conclusions and the information it collected. Plaintiffs provided to USDA both the report and the information GlobalSource collected to prepare it.

153. Upon information and belief, the cigarettes manufactured at Onondaga Nation cigarette factory are placed into commerce and not held in factory inventory. Among other things, plaintiffs' belief that these cigarettes are not held in inventory is based on GlobalSource's observation of 25-foot box trucks at two loading docks located at the rear of the factory that moved on and off the reservation, to and from the loading docks.

154. The foregoing information, as well as other relevant information, was provided to USDA and is part of the administrative record.

**Unreported Cigarette Manufacturing by T&D Enterprises**

155. To conduct its investigation of T&D Enterprises, GlobalSource researched public records; consulted confidential sources and others knowledgeable of the factory's operations; and surveyed retail stores owned by T&D Enterprises' principal, Carey Terrence.

156. GlobalSource's investigation confirmed that T&D Enterprises is an unlicensed cigarette manufacturer located on the Akwesasne reservation at 76 Geronimo Lane in Hogansburg, New York.

157. T&D Enterprises' cigarette factory has likely been in operation since at least 2008.

158.   T&D Enterprises manufactures and sells Tomohawk and Laurel packaged cigarettes and a rollies brand called 222's.  Tomohawk cigarettes are available in a variety of brands, including King and 100s sized red, silver, gold, menthol gold, "light," and "ultra-light" cigarettes.  Laurel cigarettes are available in King sized full flavor, "ultra-light" and menthol cigarettes.  222's rollies are available in King and 100s sized menthol, menthol "light", "light," full flavor, and "ultra-light" cigarettes.

159.   Under the FDCA, labeling or advertisements for a tobacco product that use the descriptors "light," "mild," or similar descriptors are prohibited unless a Modified Risk Tobacco Product order issued under Section 911(g) is effective.  21 U.S.C. § 387k(b)(2).

160.   T&D Enterprises advertises its products on local road signs throughout New York and distributes the brands to a number of local convenience stores outside any Native American reservation.  It advertises its brands outside smoke shops in Akwesasne and on the Poospatuck and Onondaga reservations.

161.   Based on aerial surveillance conducted on July 26, 2013, GlobalSource observed 10 vehicles in the factory parking lot.

162.   Reliable sources knowledgeable of T&D Enterprises' operations reported that T&D Enterprises was using two high-speed Molins Mk 9 cigarette makers and hard pack lines.

163.   Because GlobalSource estimated that the T&D Enterprise cigarette factory employs approximately 10 employees during the workday, for one 8-hour

shift, and because the factory operates two Molins Mk 9 cigarette makers and hard pack lines, GlobalSource concluded, at the most conservative manufacturing levels, that T&D Enterprises manufactures 2,500,000 cartons of cigarettes annually. (As discussed above, in December 2013 GlobalSource revised its initial findings concerning T&D Enterprises and concluded that T&D Enterprises manufactures approximately 1,287,000,000 cigarettes (or 6,435,000 cartons of cigarettes) per year.).

164.   GlobalSource investigators (non-Native American) visited two TwinLeaf convenience stores outside the Akwesasne reservation. Both stores stocked Tomohawk and Laurel brand cigarettes and 222's brand rollies. Neither store charged sales tax on any purchases, including cigarettes. In addition, product purchased by GlobalSource investigators did not bear the proper tax stamp.

165.   GlobalSource prepared a report summarizing its conclusions and the information it collected. Plaintiffs provided to USDA both the report and the information GlobalSource collected to prepare that report.

166.   Upon information and belief, the cigarettes manufactured at T&D Enterprise's cigarette factory are placed into commerce and not held in significant amounts in factory inventory. Among other things, plaintiffs' belief that these cigarettes are not held in inventory is based on GlobalSource's observations of three box trucks located at the factory.

167.   The foregoing information, as well as other relevant information, was provided to USDA and is part of the administrative record.

**Follow-Up Investigation In Support of December 2013 Joint Appeal**

168.   In December 2013, GlobalSource conducted additional surveillance of both the Onondaga Nation and T&D Enterprises cigarette factories and determined that both factories remained active.

169.   GlobalSource's follow-up investigation confirmed its initial findings regarding Onondaga Nation, and it continued to estimate that Onondaga Nation manufactures approximately 1,092,000 cartons per year.

170.   GlobalSource revised its initial findings concerning T&D Enterprises. Based on a reliable source with knowledge of T&D Enterprises' operations, GlobalSource concluded that T&D Enterprises operates two Molins Mk 9 cigarette makers and hard pack lines.  The Molins Mk 9 line is able to produce between 5,850,000 and 7,020,000 cartons of cigarettes per year.

171.   During additional surveillance of the T&D Enterprises cigarette factory, GlobalSource investigators observed approximately 20 personally owned vehicles in the factory parking lot during the day.  Based on GlobalSource's experience, factories like the T&D Enterprises cigarette factory usually have management, sales, and security personnel in addition to machine operators, warehousemen, and rollies packers (bags of rollies are packed by hand). Accordingly, as of December 31, 2013, GlobalSource estimated that T&D

Enterprises employs approximately 14 to 16 individuals who work an 8-hour day shift.

172.   GlobalSource also received source reporting that T&D Enterprises operates a four-hour night shift and employs approximately 10 people during that shift.

173.   Based on these findings, GlobalSource recognized that it had underestimated T&D Enterprises' annual production volumes for plaintiffs' challenge to USDA's September 1, 2013 quarterly assessment.   GlobalSource's updated estimate is that T&D Enterprises manufactures around 6,435,000 million cartons of cigarettes annually.

174.   The foregoing information, as well as other relevant information, was provided to USDA and is part of the administrative record.

**February 26, 2014 Hearing**

175.   On February 26, 2014, plaintiffs attended a hearing at USDA with Charles M. Berge and Darlene Soto of USDA.   Plaintiffs presented all of the evidence described above in paragraphs 69 – 174, demonstrating that USDA had over-assessed RJRT and Santa Fe in both its September 1 and December 1 quarterly FETRA assessments.

176.   During the hearing, USDA did not challenge the fact that these non-reporting manufacturers exist.   Nor did USDA present any evidence contradicting plaintiffs' estimates.

**USDA's Final Ruling**

177.   In a March 27, 2014 letter, USDA denied plaintiffs' joint appeals of both their September 2013 quarterly assessment and their December 2013 quarterly assessment.

178.   USDA began by describing its methodology for calculating assessments under FETRA.   The agency recognized its obligation to ensure that "each manufacturer's or importer's assessment is proportional to its market share within [each] class" of tobacco products.

179.   The agency also recognized that it is forbidden from charging any manufacturer or importer "an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume," *id.* (quoting 7 U.S.C. § 518d(e)(2)), and that it is required to base its calculation of domestic volume on not only excise tax and customs documents but also "any other relevant information provided to or obtained by the Secretary," *id.* at 4 (quoting 7 U.S.C. § 518d(g)(1)).

180.   USDA did not dispute that it is required by FETRA to account for "gross domestic volume from all sources."   7 U.S.C. § 518d(i)(4)(B).

181.   USDA did not dispute that non-reporting cigarette manufacturers, including Onondaga Nation and T&D Enterprises, are responsible for a significant share of domestic sales of cigarettes.   The agency neither presented nor cited any evidence that contradicts or conflicts with information provided by plaintiffs concerning Onondaga Nation and T&D Enterprises specifically or non-reporting cigarette manufacturers generally.

182.   USDA nevertheless denied in full plaintiffs' request that the Secretary revise the quarterly assessments issued to them, in order to account for domestic sales by non-reporting cigarette manufacturers.

183.   USDA determined that "there is insufficient evidence" that plaintiffs' detailed evidence of unreported cigarette production and sales by Onondaga Nation and T&D Enterprises "is relevant for the purposes of [§ 518d(g)(1))]."

184.   USDA contended that "any determinations based on" plaintiffs' evidence "would necessarily be arbitrary."   Instead, USDA chose to ignore the evidence of unreported sales.

185.   USDA stated that information concerning unreported sales first "must be substantiated by the U.S. Department of the Treasury, the U.S. Department of Homeland Security, or the U.S. Department of Justice (Bureau of Alcohol, Tobacco, and Firearms) . . . before the Secretary can rely on it when determining individual assessments pursuant to Section 625 of FETRA."   The agency cited no statutory or other authority for that limitation.

186.   USDA did not address plaintiffs' alternative argument that the agency should, at a minimum, make adjustments to their quarterly assessments based on a reasonable nationwide estimate of all unreported sales.

187.   USDA denied in full plaintiffs' requests for an adjustment to their quarterly assessments and referred plaintiffs' evidence of unreported cigarette sales to the U.S. Department of Treasury and the U.S. Department of Justice.

188.   USDA made no effort whatsoever to account for unreported cigarette sales in calculating plaintiffs' quarterly assessments.

189.   USDA stated that the letter ruling constituted the agency's "final administrative decision" on the joint appeals and that plaintiffs "may seek judicial review."

## COUNT ONE

## VIOLATION OF THE FAIR AND EQUITABLE TOBACCO REFORM ACT

190.   Plaintiffs reassert and incorporate by reference each of the above paragraphs.

191.   FETRA prohibits the Secretary from charging any manufacturer or importer an assessment in excess of the manufacturer's or importer's market share of gross domestic volume.  7 U.S.C. § 518d(e)(2).

192.   The September 2013 and December 2013 quarterly assessments imposed on plaintiffs violate that prohibition and are arbitrary and capricious, not in accordance with law, exceed USDA's statutory jurisdiction and authority, and violate plaintiffs' statutory rights to assessments that comply with Section 518d(e)(2).

193.   FETRA directs the Secretary to calculate both individual market share and gross domestic volume "based on information provided by the manufacturers and importers pursuant to subsection (h) [excise tax returns and customs forms], as well as any other relevant information provided to or obtained by the Secretary." *Id.* § 518d(g)(1).

194.   USDA's failure to base its calculation of gross domestic volume on relevant information concerning cigarette production and sales by Onondaga Nation and T&D Enterprises specifically, and by non-reporting cigarette manufacturers generally, violates the assessment methodology required by statute.

195.   USDA's failure to make any reasonable effort to account for unreported cigarette sales in calculating plaintiffs' quarterly assessments violates the assessment methodology required by the statute.

196.   FETRA directs the Secretary, in response to a challenge to a quarterly assessment, to "make any revisions necessary to ensure that each manufacturer and importer pays only its correct pro rata share of total gross domestic volume from all sources." *Id.* § 518d(i)(4)(B).

197.   USDA's final decision denying plaintiffs' joint appeals and requests to revise their September 2013 and December 2013 quarterly assessments violates the statutory requirements.

198.   USDA's final decision denying plaintiffs' joint appeals and requests to revise their September 2013 and December 2013 quarterly assessments relies on an unreasonable and impermissible interpretation of the statutory requirements.

199.   USDA should be ordered to correct RJRT's and Santa Fe's September 2013 and December 2013 quarterly assessments to reflect each company's correct market share, and USDA should be enjoined from imposing further assessments without reasonably accounting for unreported cigarette production and sales.

## COUNT TWO

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

200.   Plaintiffs reassert and incorporate by reference each of the above paragraphs.

201.   The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, . . . or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

202.   USDA has arbitrarily, capriciously, and contrary to law refused to consider relevant information concerning cigarette production and sales by Onondaga Nation and T&D Enterprises specifically, and by non-reporting cigarette manufacturers generally.

203.   USDA's September 2013 and December 2013 quarterly assessments, and its denial of plaintiffs' joint appeals of those assessments, rest on a failure by the agency to reasonably consider the mandated statutory factor of gross domestic volume from all sources.

204.   USDA's decision to treat unreported cigarette production and sales as constituting 0% of gross domestic volume, despite uncontradicted evidence to the contrary, is arbitrary and capricious, not in accordance with the law, in excess of USDA's statutory jurisdiction, and short of statutory right.

205.   USDA's quarterly assessments, and denial of plaintiffs' joint appeals of those assessments, are contrary to the undisputed evidence before the agency and arbitrary and capricious.

206.   USDA's final decision denying plaintiffs' joint appeals and requests to revise their September 2013 and December 2013 quarterly assessments represents an unexplained and unreasonable departure from past agency practice and precedent, and therefore is arbitrary and capricious.

207.   USDA's final decision denying plaintiffs' joint appeals also raises grave constitutional concerns under the Due Process Clause of the Fifth Amendment because it arbitrarily burdens one set of private parties with the delinquent financial obligations of another set of private parties, for reasons unrelated to the conduct or liabilities of the burdened parties.

208.   USDA's September 2013 and December 2013 quarterly assessments, and its denial of plaintiffs' joint appeals of those assessments, are arbitrary and capricious, not in accordance with law, in excess of USDA's statutory jurisdiction and authority, and in violation of plaintiffs' statutory rights.

209.   USDA should be ordered to correct RJRT's and Santa Fe's September 2013 and December 2013 quarterly assessments to reflect a reasonable calculation of RJRT's and Santa Fe's correct market shares, and USDA should be enjoined from imposing further assessments without reasonably accounting for unreported cigarette production and sales.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request an Order from this Court:

A.     Declaring that USDA's failure to account for unreported cigarette production and sales in calculating RJRT's and Santa Fe's market share violates controlling federal law, including the Fair and Equitable Tobacco Reform Act and the Administrative Procedure Act;

B.     Directing USDA to correct RJRT's and Santa Fe's September 2013 quarterly assessments reducing them by $119,004.92 and $6,543.83, respectively, and their December 2013 quarterly assessments by $257,148.50 and $15,836.10, respectively; or, in the alternative, to correct those assessments to an amount that USDA reasonably determines to reflect RJRT's and Santa Fe's respective correct pro rata share when unreported cigarette production and sales are taken into account;

C.     Enjoining USDA from imposing further assessments on RJRT and Santa Fe without reasonably accounting for cigarette production and sales by Onondaga Nation and T&D Enterprises specifically, and by non-reporting cigarette manufacturers generally; and

D.     Awarding any other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Mark S. Brown
Mark S. Brown
  D.C. Bar No. 455359
Jeffrey S. Bucholtz
  D.C. Bar No. 452385
Ashley C. Parrish
  D.C. Bar No. 464683
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC  20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
Email: mbrown@kslaw.com

*Counsel for Plaintiffs*

DATE:  August 14, 2014