## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| R.J. REYNOLDS TOBACCO COMPANY, *et al.*, | ) ) ) ) | |
| PLAINTIFFS, | ) ) | |
| v. | ) ) | Civ. No. 14-cv-1388 (KBJ) |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | ) ) ) | |
| DEFENDANTS. | ) ) ) | |

## MEMORANDUM OPINION

Congress enacted the Fair and Equitable Tobacco Reform Act of 2004 (the "FETRA"), Pub. L. 108–357 § 601, 118 Stat. 1418, 1521 (2004) (codified at 7 U.S.C. §§ 518 *et seq.*), to wean tobacco farmers off of U.S. government subsidies at the expense of the manufacturers and importers of cigarettes and other tobacco products. Pursuant to the FETRA, the manufacturers and importers of tobacco products assume financial responsibility for making subsidy payments to tobacco growers for a period of ten years, and the Commodity Credit Corporation ("CCC"), an agency within the United States Department of Agriculture ("USDA"), determines on a quarterly basis the particular FETRA payments that each manufacturer or importer has to make—a determination that, by statute, must be based upon the manufacturer's or importer's relative share of the overall domestic market for tobacco products. Plaintiffs R.J. Reynolds Tobacco Company and Santa Fe Natural Tobacco Company ("Plaintiffs") have long believed that the CCC has underestimated the size of the overall domestic

market by excluding illegal cigarette sales from the FETRA calculation and, thereby, has overcharged Plaintiffs with respect to their quarterly FETRA assessments.

To support their contention that the domestic market for cigarette sales is larger (and, thus, Plaintiffs' relative market share smaller) than the figures that the CCC has used to calculate FETRA assessments, Plaintiffs commissioned a private investigation in 2012 that, according to Plaintiffs, proves that two Native American tribes in upstate New York are engaged in the unlawful manufacturing and selling of cigarettes. Plaintiffs then launched administrative challenges to two of their 2013 quarterly FETRA assessments based on the findings of their own report, insisting that the CCC had no choice but to credit their study's conclusions and adjust the assessments accordingly.  When the agency announced that it would not accept Plaintiffs' findings regarding illegal sales because they were not relevant to the FETRA calculation insofar as the figures were imprecise and had not been substantiated by another federal agency, Plaintiffs filed the instant lawsuit against the USDA, the Farm Service Agency, the CCC, Tom Vilsack (in his official capacity as Secretary of the USDA), and Juan Garcia (in his official capacity as Administrator of the Farm Services Agency and Executive Vice President of the CCC), claiming that the agency's refusal to accept their findings violates both the terms of the FETRA and the prohibition against arbitrary and capricious decision making that appears in the Administrative Procedure Act ("APA"). (*See* Compl., ECF No. 1, ¶¶ 194–95 (Count One: FETRA); 200–09 (Count Two: APA).)

Before this Court at present is Defendants' motion to dismiss Plaintiffs' complaint.  Defendants assert that the allegations of Plaintiffs' complaint establish that the USDA has complied with the FETRA and the APA as a matter of law, and thus that

Plaintiffs' complaint fails to state a claim upon which relief can be granted.  For the reasons explained below, this Court agrees with Defendants that the FETRA permits the agency to decide to credit only precise figures that other government agencies have already substantiated, and therefore, the CCC's refusal to accept Plaintiffs' study was consistent with the law.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139–140 (1944). The Court also agrees with Defendants that Plaintiffs' APA claim cannot proceed because the FETRA provides an adequate remedy for their grievances.  Consequently, Defendants' motion to dismiss Plaintiffs' complaint will be **GRANTED**.

A separate order consistent with this Memorandum Opinion will follow.

## I.      BACKGROUND

### A.      The Fair and Equitable Tobacco Reform Act of 2004

The Fair and Equitable Tobacco Reform Act of 2004 ("FETRA") puts an end to federal tobacco subsidy and price support programs.  *See* 7 U.S.C. §§ 518 *et seq.*  Price supports and marketing quotas for U.S. tobacco growers were initially established during the Great Depression as a means of stabilizing the domestic tobacco market.  *See generally* Agricultural Adjustment Act of 1938, 7 U.S.C. §§ 1281–1407.[1]  The subsidy

---

[1] Tobacco growers are not unique in this respect.  Many of the nation's crops are (or were) subject to a government-imposed quota system.  *See, e.g.*, Matthew Nis Leerberg, Note, *Takings and Statutory Entitlements: Does the Tobacco Buyout Take Quota Rights Without Just Compensation?*, 55 Duke L.J. 865, 865 & n.1 (2006) (observing past and present quota systems for corn, wheat, cotton, rice, and peanuts).  Under this system as it pertains to tobacco, the "USDA set the amount of tobacco a producer could sell during a given season and the price at which he could sell it . . . . [and  t]he only way a producer of tobacco could sell his product was to own or lease [a] quota."  Ryan D. Dreveskracht, *Forfeiting Federalism: The Faustian Pact with Big Tobacco*, 18 Rich. J.L. & Pub. Int. 291, 306–07 (2015) (internal quotation marks omitted) (footnote omitted).  By limiting competition, the quota systems increased U.S. tobacco prices.  Bruce Yandle et al., *Bootleggers, Baptists & Televangelists: Regulating Tobacco by Litigation*, 2008 U. Ill. L. Rev. 1225, 1231 n.13.  Simultaneously, the government established a "support price"—a target price for tobacco sales.  *Lay v. Burley Stablization Corp.*, No. 3:09-CV-252, 2010 WL 2639931, at *1 (E.D. Tenn. June 28, 2010).  A grower unable to sell his crop at a price at least as high as the support price would be supported by the government's direct purchase of that crop at the support price.  *See id.*  The parties describe this system of quotas and price supports as "subsidies," and so does the Court.

system functioned relatively well for nearly 70 years but, beginning in the early 1990s, several factors converged to convince Congress that the time had come to terminate the tobacco subsidy program.  *See, e.g.*, *State v. Philip Morris USA Inc.*, 618 S.E.2d 219, 220 (N.C. 2005) (explaining that tobacco quotas and price supports began to "work[] at cross-purposes"); *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 241– 42 (3d Cir. 2001) (discussing the nationwide mass tort lawsuit that state attorneys general brought against tobacco-product manufacturers); *see also* Craig P. Raysor, *From the Sword to the Pen: A History and Current Analysis of U.S. Tobacco Marketing Regulations*, 13 Drake J. Agric. L. 497, 528 (2008).  Instead of abruptly terminating seven decades of tobacco-production subsidies, however, Congress chose to taper off the payments to tobacco growers slowly, through a new system called the Tobacco Transition Payment Program ("TTPP").  *See* Pub. L. No. 108–357 §§ 601–43, 118 Stat. 1418, 1522–36 (Oct. 22, 2004) (codified in part as amended at 7 U.S.C. §§ 518–19a). Pursuant to the TTPP, tobacco growers who had previously benefited from the repealed subsidy programs became eligible for ten years of transition payments, from fiscal year 2005 through fiscal year 2014.  *See* 7 U.S.C. § 518d(b)(1)–(2); *id.* § 518d(k).

The TTPP served two purposes.  First, the transitional payments served to "cushion" tobacco growers against "the initial shock" of the rapid price plummet that the move to a free market precipitated.  Raysor, *supra*, at 536.  "According to the legislative history," Congress hoped that during this ten-year buyout period "[t]obacco [g]rowers would either become more competitive with the free market or would transition to new crops or would move to entirely different means of earning a living." *In re Int'l Tobacco Partners, Ltd.*, 468 B.R. 582, 585 (Bankr. E.D.N.Y. 2012) (citing

150 Cong. Rec. H8704–03, at *H8717–18).  Second, the payments relieved the federal

government of its responsibility for subsidizing the tobacco growers out of the public

fisc and intentionally transferred that responsibility to tobacco-product manufacturers

and importers.  *See* 7 U.S.C. § 518d(b)(1)–(2); *see also State v. Philip Morris USA Inc.*,

No. 98 CVS 14377, 2004 WL 2966013, at *4 (N.C. Super. Ct.) (noting that "[s]ince the

dismantling of [the quota] systems benefits the tobacco companies, Congress made

them pay for it"), *rev'd on other grounds by State v. Philip Morris USA Inc.*, 618 S.E.2d

219 (N.C. 2005).  Tobacco-product manufacturers understood and accepted this shift in

responsibility for making the subsidy payments to tobacco farmers; in fact, this

financial obligation was specifically envisioned during the negotiations that preceded

the 1998 nationwide settlement of mass tort litigation that state attorneys general had

brought against Big Tobacco.  *See generally* Raysor, *supra*, at 524–31.[2]

---

[2] The cases that state attorneys general brought against the tobacco-product manufacturers were resolved pursuant to a Master Settlement Agreement ("MSA") that the parties understood would result in reduced tobacco consumption.  *See Philip Morris*, 618 S.E.2d at 221.  Consequently, the MSA required the manufacturers to meet with the leadership of the tobacco-growing states to find ways to mitigate the "potentially negative economic consequences." *Id.*  Those meetings resulted in the National Tobacco Grower Settlement Trust Agreement ("Trust Agreement"), in which, among other things, the tobacco-product manufacturers agreed to spend approximately five billion dollars on economic assistance to tobacco farmers.  *See id.*  These payments were intended to ease tobacco growers' worries amidst the rising product prices and lower consumer demand that other settlement terms caused, *see* Raysor, *supra*, at 529–30, and "[t]he parties drafted the Trust Agreement knowing federal and state governments might take additional measures to aid tobacco farmers[,]" including "measures [that] would probably entail *additional* assessments" against Big Tobacco, *Philip Morris*, 618 S.E.2d at 222 (emphasis added).  Accordingly, the Trust Agreement included a "Tax Offset Adjustment" that allowed tobacco manufacturers to reduce their payments to growers under the agreement if a "Governmental Obligation"—defined as "a new or increased" obligation to pay monies "used in whole or in part for the benefit of tobacco farmers"—was subsequently imposed. *Id.*; *see also* Dreveskracht, *supra* note 1, at 309 (explaining that the Tax Offset Adjustment was included so that, "if [tobacco-product manufacturers were] required by law to pay any more than the amount [they] agreed to pay under [the Trust Agreement,] . . . all of the benefit that the tobacco farmers were supposed to receive from the MSA would disappear in lieu of a new benefit conferred by state or federal legislation").  Thus, tobacco-product manufacturers benefited financially from Congress's enactment of the FETRA insofar as, once that legislation passed, the Trust Agreement payments that the manufacturers owed to tobacco growers were eliminated.  *See id.* at 310.

1.   The Commodity Credit Corporation

The FETRA established the Commodity Credit Corporation ("CCC") as an agency within the USDA that was charged with the responsibility of managing the process of administering the transfer of payments from tobacco-product manufacturers to tobacco growers.  *See* 15 U.S.C. § 714 (creating a "body corporate to be known as Commodity Credit Corporation . . . , which shall be an agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture"); *see also* 7 U.S.C. § 518d(b)–(c) (noting that "[t]he Secretary, acting through the Commodity Credit Corporation, shall impose quarterly assessments" pursuant to FETRA).  Congress authorized the CCC to issue regulations to govern the process for collecting money from the manufacturers and importers, *see* 7 U.S.C. § 519(a), and also specifically determined that the CCC could promulgate these regulations without having to adhere to the Administrative Procedure Act's notice and comment provisions, *see id.* § 519(b)(1).  As outlined in the regulations that the CCC promulgated, the agency was to collect payments—termed "assessments"—from the manufacturers and importers of tobacco products on a quarterly basis (totaling approximately one billion a year) and deposit those assessments into the "Tobacco Trust Fund," which is a revolving trust fund that Congress created to carry out the FETRA's purposes.  *See* 7 U.S.C. § 518e(a); 7 C.F.R. § 1463.8.  So collected, those funds would then be distributed by the CCC to eligible tobacco growers and quota holders.  *See* 7 U.S.C. § 518a (providing for payments for tobacco quota holders), *id.* § 518b (providing for payments for producers of quota tobacco).

By statute, the FETRA assessment, collection, and distribution process concluded in 2014.  *See* 7 U.S.C. § 518d(k).  Over the ten-year life of the program, the CCC collected more than $10 billion in assessments from tobacco-product manufacturers and importers and distributed them to program beneficiaries in accordance with FETRA's terms.  *See* USDA, *Tobacco Transition Payment Program; Cigar and Cigarette Per Unit Assessments*, 76 Fed. Reg. 15,859 (Mar. 22, 2011); *see also* 7 U.S.C. § 518f.

2.  <u>The Process By Which The CCC Calculated Assessments</u>

The CCC's determination of the amount of the TTPP quarterly assessment to be paid by each tobacco-product manufacturer or importer involved several calculations. *See generally* Determination of the Administrator of the Farm Service Agency and Executive Vice President of the Commodity Credit Corporation Regarding the Current "Step A" and "Step B" Assessment Methods in the Tobacco Transition Payment Program, Nov. 16, 2011.[3]  First, the CCC determined the amount of the national assessment needed to make subsidy payments to tobacco growers overall, and then the CCC used a two-step process to allocate payment responsibility for that national assessment amount among the tobacco-product manufacturers and importers.  *See* 7 U.S.C. § 518d(b)(2); 7 C.F.R. § 1463.4; *see also Prime Time Int'l Co. v. USDA*, 753 F.3d 1339, 1340 (D.C. Cir. 2014); *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 285-86 (4th Cir. 2013).  In Step A, the overall national assessment amount that was to be collected from the various tobacco manufacturers and importers was allocated based on the six classes of tobacco products: cigarettes, cigars, snuff, roll-your-own tobacco,

---

[3] Available at http://www.fsa.usda.gov/Internet/FSA_File/tobacco_determ_11162011.pdf.

chewing tobacco, and pipe tobacco. *See* 7 U.S.C. § 518d(c)(1)–(2); 7 C.F.R. §§ 1463.3, 1463.5; *see also Prime Time*, 753 F.3d at 1340; *Philip Morris*, 736 F.3d at 286.[4]  In Step B, the CCC determined each manufacturer's or importer's particular "market share" within each of the classes of tobacco products. *See* 7 U.S.C. § 518d(a)(2)–3, (e)(1).  Per the FETRA, that determination was made by dividing each individual manufacturer's and importer's volume of domestic sales of the particular class of tobacco product by the total volume of domestic sales of that product. *See id.* § 518d(a)(3); *see also id.* § 518d(f).

Significantly for present purposes, Congress specified that the volume of domestic sales for each product class was a figure that the CCC must determine based on all of the non-tax-exempt tobacco products that are "removed" into domestic commerce during the assessment period. *See id.* §§ 518d(a)(2)(A), (g)(2).  The term "removed" as used in the FETRA is a term of art—it incorporates the Internal Revenue Code's definition, which broadly includes *any* means of placing tobacco products into the stream of commerce, including taking domestically manufactured products "from the factory" or "releas[ing] [imported products] from customs custody," and it also includes employing wrongful means of sale or distribution such as "smuggling or other unlawful importation."  26 U.S.C. § 5702(j).

Notably, the FETRA contains a provision that speaks specifically to the authorized sources of information that the CCC can rely upon to determine the overall

---

[4] For example, because cigarettes represented 88.499% of total national tobacco sales in the second quarter of 2013, cigarette manufacturers and importers were required collectively to contribute 88.499% of the aggregate third quarter 2013 assessments imposed on all manufacturers and importers of the specified classes of tobacco products.  (*See* Compl. ¶¶ 40–41.)

volume of sales for each class of tobacco product that has been removed into domestic commerce:

> **(g) Determination of volume of domestic sales**
> **(1) In general**
> The calculation of the volume of domestic sales of a class of tobacco product by a manufacturer or importer, and by all manufacturers and importers as a group, shall be made by the Secretary *based on information provided by the manufacturers and importers pursuant to subsection (h), as well as any other relevant information provided to or obtained by the Secretary.*

7 U.S.C. § 518d(g)(1) (emphasis added).  Subsection (h)—entitled "Measurement of volume of domestic sales"—requires each manufacturer and importer of tobacco products to submit to the CCC "a certified copy of each of the returns or forms described by paragraph (2) that are required to be filed with a Federal agency[,]" which must be provided "on the same date that those returns are filed, or required to be filed, with the agency." *See id.* § 518d(h)(1).  And paragraph (2) of subsection (h) establishes that these required submissions consist of "returns and forms" tobacco manufacturers and importers file regarding "the removal of tobacco products into domestic commerce[,]" and "the payment of taxes imposed under" chapter 52 of Title 26 of the U.S. Code.  *See id.* §§ 518d(h)(2).[5]  Thus, section 518d(g)(1) of the FETRA essentially directs the CCC to calculate the "volume of domestic sales" based on certified excise tax and customs forms and also "any other relevant information provided to or obtained by the Secretary." *Id.* § 518d(g)(1).

---

[5] As examples of the latter, paragraph (2) notes "AFT Form 5000.24 and United States Customs Form 7501."  7 U.S.C. § 518d(h)(2).  Form 5000.24 is an excise tax-return form for self-reporting tobacco-product removals that federal regulations require tobacco-product manufacturers to file with the U.S. Alcohol and Tobacco Tax and Trade Bureau, 27 C.F.R. § 40.162, and Customs Form 7501 is a general "entry summary," 19 C.F.R. § 144.12, on which importers describe products they are importing.

As mentioned, the FETRA provides that once the CCC has determined the total volume of domestic sales for each class of tobacco product, it must then calculate the market share of each tobacco-product manufacturer and allocate the national assessment amount for each class of tobacco product to each manufacturer or importer according to that entity's market share. *See id.* § 518d(e)(1) ("The assessment for each class of tobacco product . . . shall be allocated on a pro rata basis among manufacturers and importers based on each manufacturer's or importer's share of gross domestic volume."); *see also id.* §§ 518d(a)(3) (defining "market share"); *id.* § 518d(f) (requiring that "[t]he amount of the assessment for each class of tobacco product" shall be "determined . . . by multiplying" the market share of that manufacturer or importer by "the total amount of the [national] assessment for that quarterly payment period . . . for [that] class of tobacco product").  The FETRA statute also makes clear that "[n]o manufacturer or importer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume."  *Id.* § 518d(e)(2).

        3.      <u>The Process By Which Manufacturers And Importers Challenge FETRA Assessments</u>

The FETRA and its implementing regulations also provide an administrative mechanism for challenging the assessment amounts that the CCC prescribes.  Within 30 days of receiving notice of the assessment, a manufacturer or importer may submit a written statement to the agency that sets forth the basis for the challenge.  *See* 7 U.S.C. § 518d(i)(1); 7 C.F.R. § 1463.11(a).  And the FETRA specifies that, "[i]n challenging the assessment, the manufacturer or importer may use any information that is available, including third party data on industry or individual company sales volumes."  7 U.S.C.

§ 518d(i)(2).  The CCC's Executive Vice President then assigns a person to act as a hearing officer—that individual prepares an administrative record to provide the Executive Vice President with the information necessary to render a final determination on the matter in dispute.  *See* 7 C.F.R. § 1463.11(b).  The FETRA also establishes that manufacturers and importers have a right to sue in federal court: upon conclusion of the process for challenging an assessment outlined in the regulations, a manufacturer may seek federal court review of the agency's final determination.  *See* 7 U.S.C. § 518d(j); *see also* 7 C.F.R. § 1463.11(c) (noting that administrative remedies are deemed exhausted for purposes of 7 U.S.C. § 518d(j)(1) if 30 calendar days elapse following the manufacturer's or importer's final submission of challenge-related documentation to the CCC).

### B.    Plaintiffs' 2013 Assessments, Independent Investigation, And Appeal

Plaintiffs R.J. Reynolds Tobacco Company ("RJRT") and Santa Fe Natural Tobacco Company ("Santa Fe") are cigarette manufacturers that the CCC has required to pay TTPP assessments.  (*See* Compl. ¶¶ 22–23, 192.)[6]  The instant action involves two sets of quarterly assessments that the CCC charged to these manufacturers: (1) the second-quarter assessments of 2013 (dated September 1, 2013), which amounted to approximately $49.073 million by RJRT and approximately $2.746 million by Santa Fe (*Id.* ¶ 82), and (2) the third-quarter assessments of 2013 (dated December 1, 2013) in the amount of approximately $49.301 million by RJRT and approximately $3.069 million by Santa Fe (*see id.* ¶ 101).  These assessments were based on the CCC's calculation of RJRT's and Santa Fe's market shares during the assessment period, as

---

[6]  Both RJRT and Santa Fe are wholly-owned subsidiaries of Reynolds American, Inc.  (*See* Compl. ¶¶ 22–23.)

described above.  (*See supra* Part I.A.2.) It is undisputed that, when the CCC calculated

the total volume of domestic tobacco-product sales upon which the market shares of

individual manufacturers and importers are based, it did not take into account the

volume of sales resulting from any *illegal* manufacturing of tobacco products, which,

according to Plaintiffs, unlawfully skewed the FETRA calculations.  (*See id.* ¶ 130.)

> 1. <u>Plaintiffs Hire A Business Investigation Firm To Estimate How</u>
>    <u>Many Cigarettes Are Sold By Two Non-Reporting, Unlicensed</u>
>    <u>Cigarette Manufacturers</u>

According to the allegations in the complaint, the unreported and illegal

production and sale of cigarettes is a widely-recognized problem.  (*See, e.g.*, Compl.

¶ 70 (discussing a 2007 report prepared by the staff of the U.S. House Committee on

Homeland Security, which estimated that 5% of the annual domestic cigarette market of

approximately 414 billion cigarettes is unreported and untaxed); *id.* ¶ 73 (discussing a

2011 Government Accountability Office report on illicit tobacco manufacturing, which

stated that most unlicensed cigarette manufacturing occurs in northern New York.)  In

2012, Plaintiffs allegedly retained GlobalSource LLC, a business investigations firm, to

investigate the illicit cigarette trade in upstate New York (*see id.* ¶ 76, *see also id.*

¶¶ 129–39, 141–53, 155–66, 168–73), and GlobalSource's investigation focused on two

unlicensed Native American cigarette manufacturers operating in the area—the

Onondaga Nation Cigarette Factory ("Onondaga" or "Onondaga Nation") and T&D

Enterprises.[7]  According to the Complaint, neither Onondaga nor T&D Enterprises

reports its production volumes to the CCC as required under the FETRA, and the CCC

does not account for these entities' cigarette manufacturing in calculating the total

---

[7] Plaintiffs apparently chose to investigate Onondaga and T&D because these companies were
mentioned in newspaper articles about illicit cigarette manufacturing.  (*See* Compl. ¶¶ 138–39.)

volume of domestic cigarettes removed into the stream of commerce for FETRA purposes. (*See id.* ¶¶ 11, 129.)

GlobalSource investigators allegedly employ a number of accepted methods of investigation to gather information, and according to Plaintiffs, law enforcement and regulatory agencies have routinely relied on information developed in GlobalSource investigations to initiate enforcement actions or to prompt further investigations that result in civil or criminal actions. (*See id.* ¶¶ 131–35.) To conduct its investigation of Onondaga and T&D Enterprises, GlobalSource allegedly researched public records, conducted targeted surveillance (including on-the-ground surveillance) of manufacturing facilities, consulted confidential sources and others knowledgeable of the factories' operations and production equipment used, performed in-person and telephone interviews, and surveyed retail cigarette shops that sell cigarettes made by Onondaga and T&D Enterprises. (*See id.* ¶¶ 141, 155.) Based on this research, GlobalSource estimated that Onondaga manufactures approximately 1.092 million cartons of cigarettes per year and that T&D Enterprises manufactures approximately 6.5 million cartons per year. (*See id.* ¶¶ 10, 148, 163.) Moreover, according to GlobalSource, the cigarettes that Onondaga and T&D Enterprises manufacture end up being distributed off of their respective reservations, ultimately making their way into the broader domestic cigarette market. (*See id.* ¶¶ 149–50, 153, 159, 163, 166.)[8]

---

[8] Plaintiffs stress that only cigarettes sold on Native American Indian reservations to reservation members are exempt from federal excise taxes, and thus that federal excise tax laws and associated reporting requirements apply to cigarettes that are manufactured by Native American tribes and sold either outside the reservation or to a purchaser who is not a reservation member. (*See* Compl. ¶¶ 67–68.) Therefore, Plaintiffs argue, the figures in the GlobalSource report represent an informed estimation of the volume of illegal (unreported) cigarette sales by Onondaga and T&D Enterprises.

2. Plaintiffs Request Revision Of Their September 2013 And December 2013 Quarterly Assessments Based On GlobalSource's Findings

In light of GlobalSource's findings, RJRT and Santa Fe challenged the amount of the quarterly assessments that the CCC had allocated to them for September 2013 and December 2013 under the FETRA. (*See* Compl. ¶¶ 7–9, 82–86, 101–05.) Specifically, Plaintiffs argued that the CCC had overcharged them because the agency had failed to account for illegal cigarette manufacturers generally, and the production by Onondaga and T&D Enterprises in particular, when it determined the total domestic volume of cigarette production. (*See id.* ¶¶ 85–99, 104–118.) Plaintiffs insisted that, as a result of this alleged miscalculation, they were entitled to a reduction in their respective assessments: at least $119,004 for RJRT and $6,543 for Santa Fe for the September 2013 quarterly assessment, and at least $257,148 for RJRT and $15,836 for Santa Fe for the December 2013 quarterly assessment. (*See id.* ¶¶ 12, 99, 118.) Plaintiffs arrived at these sums by applying a complicated formula that was designed to generate the particular assessment amounts that Plaintiffs believed the agency would have charged RJRT and Santa Fe *if* the cigarette sales of T&D Enterprises and Onondaga Nation had been included in the agency's gross domestic volume calculations.[9]

---

[9] Plaintiffs' calculation of the revised assessment amounts involved several steps. First, GlobalSource estimated the number of cigarettes that T&D Enterprises and Onondaga Nation manufactured on an annual basis, as explained, and Plaintiffs divided that number by four to arrive at each company's quarterly volume of domestic sales. (*See id.* ¶ 89–90.) Then, Plaintiffs multiplied the combined total of the quarterly volume of cigarette sales of T&D Enterprises and Onondaga Nation by the 2013 federal excise tax rate and, thereby, estimated the federal excise taxes that T&D Enterprises and Onondaga Nation should have paid during the payment period. (*See id.* ¶¶ 91–92.) Next, Plaintiffs added the estimated T&D Enterprises and Onondaga Nation excise taxes to the total reported gross excise taxes paid for the cigarette class for the reported period, and estimated the adjusted gross domestic volume for the cigarette class. (*See id.* ¶¶ 93–94.) Plaintiffs then divided the total gross excise taxes paid by RJRT and Santa Fe during the payment period by the new adjusted gross excise taxes for the cigarette class that included T&D Enterprises and Onondaga Nation. (*See id.* ¶ 95.) Finally, Plaintiffs multiplied the total program costs by each company's adjusted market share, and the total interest costs by each company's adjusted market share. (*See id.* ¶ 96–99.)

Plaintiffs detailed their estimates and calculations on the required administrative dispute forms and filed their objections regarding the September 2013 and December 2013 assessments on September 30, 2013, and December 31, 2013, respectively.  (*See* Compl. ¶¶ 85, 104.)

3.      <u>Defendants Hold A Hearing To Consider Plaintiffs' Argument That Their September 2013 And December 2013 Assessments Should Be Reduced</u>

The CCC's hearing officer reviewed Plaintiffs' submissions and responded to Plaintiffs' challenge to the September 2013 quarterly assessment in writing, on November 15, 2013.  (*See* Compl. ¶ 120.)  The agency articulated its view that "no revisions are warranted" because RJRT and Santa Fe did not "allege that CCC has miscalculated the assessment as a function of the tax and custom forms it has received"; rather, "[t]he allegation that [Plaintiffs] raise[d] as a basis for [their] appeal is an allegation of tax evasion" by Onondaga and T & D Enterprises.  (*Id.* (third and fourth alterations in original).)  Plaintiffs responded to this decision on December 9, 2013, requesting a hearing "to provide evidence and testimony establishing that the [CCC's] determination was erroneous, arbitrary and capricious, and not in accordance with law." (*Id.* ¶ 121.)  The Executive Vice President of the CCC granted Plaintiffs' request, and a hearing was scheduled for February 26, 2014.  (*See id.* ¶ 122.)[10]

In advance of the hearing, Plaintiffs submitted documents that Plaintiffs believed supported a reduction in RJRT's and Santa Fe's respective quarterly assessments,

---

[10] Although the CCC did not respond directly to Plaintiffs' challenge to the December 2013 quarterly assessment, it told Plaintiffs informally that it would deny the December 2013 challenge on the same grounds as the September 2013 challenge; accordingly, the scheduled hearing concerned Plaintiffs' challenges to both quarterly assessments.  (*See id.* ¶ 123.)

including a letter brief and the declarations of two witnesses that Plaintiffs intended to present at the hearing.  (*See id*. ¶124.)  Specifically, Steve Gentry, Senior Director of Regulatory Taxes for Plaintiffs, provided a statement regarding the calculations behind the challenged assessment amounts for September and December 2013, and Richard Hynes, case manager for GlobalSource, provided a declaration regarding the GlobalSource investigation.   (*See id*.)  Plaintiffs also provided the agency with several government reports, lists, and figures regarding unreported cigarette manufacturing that Plaintiffs had obtained under the Freedom of Information Act and from publically available studies.  (*See id*. ¶¶ 130, 135.)

At the hearing, Plaintiffs relied on these facts to argue that the CCC's "categorical exclusion" of unreported manufacturing from the total domestic volume figure "in the face of relevant evidence of significant contributions to total domestic volume[] violates Congress's plain command" in the FETRA.  (Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n"), ECF No. 12, at 27 (citing 7 U.S.C. § 518d(g)(1), (i)(4)(B)); *see also* Compl. ¶ 126.)[11]  Plaintiffs first pointed out that the FETRA states that a tobacco manufacturer cannot be charged more than its "correct pro rata share of total gross domestic volume from all sources," (*see* Pls.' Opp'n at 27–28 (citing 7 U.S.C. § 518d(g)(1)) (emphasis deleted)), which, according to Plaintiffs, means that Congress intended assessments to be "proportionate to a manufacturer's share of the *entire* market for the relevant tobacco product[,]" (*id.* at 27 (emphasis in original).)  And, in Plaintiffs' view, the entire market for cigarettes *must* include cigarettes that are manufactured and sold illegally, because the TTPP assessments are calculated based on

---

[11] Citations to the documents the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

the volume of "removed" tobacco products as defined in the Internal Revenue Code, and the Code defines removal to include any means of placing tobacco products in the stream of commerce, including unlawful means such as "unlawful importation."  (*Id.* at 28; *see also id.* (asserting that the "FETRA cannot be reasonably construed to carve out unlawful or unreported cigarette production from the scope of 'total volume of domestic sales'").)  Plaintiffs then maintained that, when determining the volume of illegal sales as the FETRA requires the CCC to do, Congress has expressly prevented the CCC from accepting only *certain* information regarding such sales, and instead, enacted a statute that requires the agency to rely on "all 'relevant information'" regarding the proportion of the domestic market that is comprised of illegal sales.  (*Id.* at 30 (quoting 7 U.S.C. § 518d(g)(1)); *see also id.* ("[W]hen presented with relevant information of cigarette removals by non-reporting manufacturers, USDA is obligated to reasonably account for that illicit production in its calculation of total domestic volume to ensure that law-abiding manufacturers are not required to pay more than their lawful pro rata share." (citing and discussing 7 U.S.C. § 518d(g)(1))).)

In sum, Plaintiffs argued at the hearing that, "by unreasonably excluding *all* unreported cigarette manufacturers," the agency had "erroneously inflat[ed] [plaintiffs'] market share and concomitant assessments" in violation of the FETRA's "demand[] that assessments must be proportionate to each company's market share."  (Pls.' Opp'n at 26 (emphasis in original).)

    4.    <u>Defendants Deny Plaintiffs' Request Because The GlobalSource Findings Are Not "Relevant" Within The Meaning Of The Statute</u>

In a letter dated March 27, 2014—which is quoted in the complaint and relied upon extensively by both parties—the Executive Vice President of the CCC denied

Plaintiffs' joint administrative appeals.  (*See* Compl. ¶ 177; *see also* Letter from Juan

M. Garcia, Exec. VP, CCC, to Mitchell Neuhauser and Mark Brown, attorneys for RJRT

and Santa Fe (Mar. 27, 2014) ("March 27, 2014 Letter Ruling"), Ex. 1 to Defs.' Mot. to

Dismiss, ECF No. 10-1).)  The decision letter began by describing the CCC's

methodology for calculating assessments under the FETRA (*see* March 27, 2014 Letter

Ruling at 2–4), and by noting that the agency has a statutory obligation to ensure that

"each manufacturer's or importer's assessment is proportional to its market share within

[each] class" of tobacco products (*id.* at 3, 5 (citing 7 U.S.C. § 518d(e)(1); 7 C.F.R

§ 1463.7)).  The letter further acknowledged that the agency is required to base its

calculation of domestic volume not only on excise tax and customs documents but also

"any other relevant information provided to or obtained by the Secretary[,]" (*id.* at 5

(quoting 7 U.S.C. § 518d(g)(1))), and it rehearsed Plaintiffs' factual and legal

assertions regarding inclusion of the volume of illegal sales (*see id.*).  The CCC's

Executive Vice President expressed no disagreement with Plaintiffs' underlying

assertion that non-reporting cigarette manufacturers, including Onondaga Nation and

T&D Enterprises, are responsible for a share of domestic cigarette sales (*see id.*; *see

also* Compl. ¶ 181); nevertheless, his letter explained that Plaintiffs' request that the

Secretary revise their quarterly assessments to account for illegal sales by non-reporting

cigarette manufacturers was being denied in full because there was "insufficient

evidence to determine that the information offered by [Plaintiffs] is relevant for the

purpose of [7 U.S.C. 518d(g)(1)]."  (*See id.* at 6–7 (citing 7 U.S.C. § 518d(g)(1).)

The letter offered two reasons for this conclusion.  First, it explained that the

information that Plaintiffs had provided regarding illicitly traded cigarettes had not

been reported in official government documents and substantiated by other federal agencies.  (*See id.* at 6 ("The information and evidence presented by the [Plaintiffs] must be substantiated by the U.S. Department of the Treasury, the U.S. Department of Homeland Security, or the U.S. Department of Justice (Bureau of Alcohol, Tobacco, and Firearms) as appropriate, before the Secretary can rely upon it when determining individual assessments[.]").)  The letter pointed out that Plaintiffs had "acknowledge[d] that they have not provided [the] CCC with copies, certified or otherwise, of excise tax returns with respect to the alleged removals [of cigarettes by Onondaga Nation and T&D Enterprises] and [Plaintiffs] further acknowledge that they have not provided any of their investigatory information to any relevant tobacco enforcement agencies." (*Id.* at 5.)

Second, the letter stated that the information that Plaintiffs had provided regarding illicitly traded cigarettes was not sufficiently specific.  (*See id.* at 6.)  In the Executive Vice President's view, Plaintiffs' evidence and testimony was "largely based on estimates, approximations, and assumptions," and thus the CCC could not "reliably, much less accurately, determine amounts and timing of the tobacco placed into commerce so as to correctly adjust quarterly [Plaintiffs'] TTPP assessment levels." (*Id.*)  The letter further explained that "[t]he timing and amounts of the alleged removals are critical, because quarterly assessments are based on a tobacco company's share of gross domestic volume *for each fiscal quarter*; they are not based on annual estimations of such volume."  (*Id.* (emphasis added).)  "Consequently," the Executive Vice President concluded that "any determinations by the Secretary based on this anecdotal information would necessarily be arbitrary."  (*Id.*)

The letter memorializing the CCC's denial of Plaintiffs' consolidated appeals emphasized that, absent such clarity and confirmation by another agency, Plaintiffs' illegal-sales estimates were not "relevant" within the meaning of 7 U.S.C. § 518d(g)(1), and, therefore, that the agency need not use those figures in determining Plaintiffs' TTPP assessments.  The Executive Vice President concluded the correspondence by stating that the "CCC is forwarding the evidence presented to it by [Plaintiffs] to the proper authorities at the U.S. Department of the Treasury and the U.S. Department of Justice (Bureau of Alcohol, Tobacco, and Firearms)." (*Id.*)  Moreover, he "encourage[d] the [Plaintiffs] to likewise submit to those agencies this and any other information [the Plaintiffs] believe[] demonstrates that a tobacco manufacturer or importer has failed to report the removal of tobacco products or payment of excise taxes for such products." (*Id.*)  In addition, the letter informed Plaintiffs that, "at such time that CCC receives a determination by an appropriate enforcement authority (of amounts and timing of the tobacco removals)[,] CCC will consider that information" during the annual assessment audit process (*id.* at 7), and would do so "retroactively if necessary" (*id.* at 6).  Thus, the CCC represented to Plaintiffs that if another federal agency subsequently substantiated the GlobalSource report, the agency would consider the Plaintiffs' figures regarding illegal cigarette sales to be relevant to the CCC's calculation of the gross domestic volume and revise the assessments accordingly.  Until that happened, however, the agency had determined "[f]or the reasons cited above, [that Plaintiffs'] request that the Secretary revise their quarterly assessments is <u>denied</u>." (*Id.* at 7 (emphasis in original).)

### C.     Procedural History

Plaintiffs filed the instant complaint on August 14, 2014.  Count One alleges that the CCC violated the FETRA when it "fail[ed] to base its calculation of gross domestic volume on relevant information concerning cigarette production and sales by Onondaga Nation and T&D Enterprises specifically, and by non-reporting cigarette manufacturers generally," and otherwise "fail[ed] to make any reasonable effort to account for unreported cigarette sales in calculating plaintiffs' quarterly assessments[.]"  (Compl. ¶ 194–95.)  Count Two alleges that this same behavior violated the Administrative Procedure Act's prohibition on arbitrary and capricious agency decision making.  (*See id.* ¶¶ 200–09.)

On December 2, 2014, Defendants moved for dismissal of Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Defs.' Mot. to Dismiss ("Defs.' Mot."), ECF No. 10.)  In Defendants' view, "[t]he central issue in this litigation is a pure question of law: is [the CCC] . . . required to give weight to [P]laintiffs' . . . study regarding the amount of illicitly traded tobacco products?"  (*See* Defs.' Mot at 5.)  Defendants contend that "[t]he answer to that question is no" (*id.*)— reasoning, as to Count One, that the CCC was not obligated to credit Plaintiffs' estimates of illicitly traded cigarettes because "it is reasonable and lawful for [the CCC]—an agency without law enforcement or investigatory capabilities regarding tobacco products—to refuse to give weight to reports of illicitly traded cigarettes that are not corroborated by a federal agency with either law enforcement or investigatory powers[,]" and, with respect to Count Two, that "[P]laintiffs cannot proceed with a claim under the APA when FETRA provides an adequate remedy for challenging alleged over-assessments" (*id.* at 12).

This Court held a hearing on Defendants' motion on June 9, 2015.

## II.   LEGAL STANDARDS

Defendants have moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), rather than summary judgment pursuant to Rule 56, and have not filed the administrative record with the Court.  Although "[s]ummary judgment is [ordinarily] the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review[,]" *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010), a Rule 12(b)(6) motion to dismiss can be entertained in administrative law cases if the complaint "presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action[,]" *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1999).  In such a case, "the sufficiency of the complaint *is* the question on the merits, and there is no real distinction . . . between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Id.* (emphasis added); *see also Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001) (holding that the district court did not err by failing to direct the agency to produce the administrative record because the case could be resolved based on "nothing more than the statute and its legislative history"); *cf. Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (explaining that a district court reviewing agency action may resolve the purely legal question of whether the agency acted arbitrarily and capriciously on the agency record irrespective of the precise motion in which it is presented).  So it is here.  Defendants have asserted—and Plaintiffs do not contest—that "[t]he central issue in this litigation

is a pure question of law," (Defs.' Mot at 1), and this Court agrees; consequently, it is procedurally proper for Defendants to have filed a Rule 12(b)(6) motion to dismiss the complaint in the instant case.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the factual allegations that appear on the face of the complaint.  When evaluating a Rule 12(b)(6) motion to dismiss, a court generally does not consider matters beyond the pleadings. *See Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119–20 (D.D.C. 2011).  However, the court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss[.]" *Id.* at 119 (internal quotation marks and citations omitted); *see also Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (same).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 129 (D.C. Cir. 2012).  A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Moreover, in assessing whether or not the plaintiff has stated a plausible claim for relief, courts do not question "the truth of what is asserted or determin[e] whether a plaintiff has any evidence to back up what is in the complaint." *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 467 (D.C. Cir. 1991).

Instead, the Court must "treat the complaint's factual allegations as true, and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citations omitted) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

## III.   ANALYSIS

Plaintiffs assert that the CCC's "categorical exclusion" of unreported cigarette manufacturing "in the face of relevant evidence of significant contributions to total domestic volume[] violates Congress's plain command to account for 'total gross domestic volume from all sources,' using all 'relevant information' available[.]" (Pls.' Opp'n at 27 (quoting 7 U.S.C. § 518d(g)(1), (i)(4)(B)).)  Notably, the agency decision that Plaintiffs challenge here is a relatively narrow one—the CCC did not conclude that illegally sold cigarettes could *never* factor into the calculation of the volume of domestic sales for FETRA purposes, nor did the agency appear to disagree with Plaintiffs' core contention that the CCC may rely upon information other than excise tax returns and customs forms to calculate the volume of domestic sales.  Rather, the CCC rejected Plaintiffs' insistence that the FETRA requires the agency to deem the GlobalSource report "relevant information" as that term is used in the FETRA.  Put another way, while, in Plaintiffs' view, the term "relevant information" in 7 U.S.C. § 518d(g)(1) must mean *anything* that is related to the volume of domestic sales of tobacco products (*see* Pls.' Opp'n at 33–34), the CCC determined that information that is related to the volume of domestic sales is only "relevant" to the agency's calculation for FETRA purposes if the information is precise and also substantiated by another

government agency (*see* Defs.' Mot. at 12–14).  According to the CCC, standard principles of statutory interpretation support this result, because (1) the phrase "other relevant information" in section 518d(g)(1) appears as part of a list that includes only information that is precise and verified by another federal agency, and (2) Congress has not provided the CCC with the tools that would be necessary for that agency to verify the GlobalSource report or any other such numbers presented to by tobacco manufacturers to reduce their assessment liability.

For the reasons explained below, this Court finds that the agency is correct that the phrase "other relevant information" can be interpreted to mean only precise figures that have been submitted to and substantiated by another federal agency, and thus, the Court concludes that Defendants' refusal to credit Plaintiffs' findings regarding the volume of illegal sales does not violate the FETRA.  Moreover, this Court finds that Plaintiffs may not challenge their September 2013 and December 2013 assessments under the APA's judicial-review provisions because the FETRA provides Plaintiffs with an adequate means of challenging assessments.

### A.   The Agency Properly Determined That The GlobalSource Study Was Not "Relevant Information" For FETRA Purposes

#### 1.   This Court Will Apply *Skidmore* Deference To The Agency Decision At Issue Here

Defendants have not argued that the CCC's interpretation of section 518d(g)(1) in this case carries the force of law and is therefore entitled to the high level of deference the Supreme Court describes in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (explaining that "administrative implementation of a . . .  statutory provision qualifies for *Chevron* deference when it appears that Congress delegated

authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority").  But Defendants' apparent reluctance to claim that *Chevron* deference applies does not necessarily mean that the CCC's determination here warrants *no* deference; indeed, the Supreme Court has long recognized that "the well-reasoned views of the [agency] implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–140 (1944)).  "The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position[.]"  *Mead Corp.*, 533 U.S. at 228 (citing *Skidmore*, 323 U.S. at 139–140) (footnotes omitted).  Pursuant to *Skidmore*, "the thoroughness evident in [the agency's] consideration," and also "the validity of its reasoning" and "its consistency with earlier and later pronouncements," *id.* (quoting *Skidmore*, 323 U.S. at 140), can all "persuade" the Court that the agency's view is correct, *Skidmore*, 323 U.S. at 140.  In other words, the agency's reading of its statute is "'entitled to respect,' . . . but only to the extent that those interpretations have the 'power to persuade,' even where they lack [*Chevron*'s] 'power to control.'" *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore*, 323 U.S. at 140).

     In light of these standards, this Court has focused its analysis on the persuasiveness of the CCC's statutory interpretation—without regard to whether that

agency determination is entitled to *Chevron* deference under the circumstances presented here. The Court's conclusion that the agency has interpreted section 518d(g)(1) correctly when viewed through the less deferential lens offered by *Skidmore*—which is explained fully below—renders it unnecessary for the Court to decide the *Chevron* versus *Skidmore* question. *See, e.g.*, *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002) (finding there was "no need to resolve any question of deference" because the agency's rule was "not only a reasonable one, but the position [the Court] would adopt even if there were no formal rule").

### 2. Defendants Have Correctly Interpreted The Term "Other Relevant Information" As It Appears In 7 U.S.C. § 518d(g)(1)

As noted, the FETRA specifically requires the CCC to calculate "the volume of domestic sales of a class of tobacco product . . . based on information provided by manufacturers and importers pursuant to subsection (h), as well as any other relevant information provided to or obtained by the Secretary." *See* 7 U.S.C. § 518d(g)(1). Plaintiffs insist that the statute's reference to "other relevant information" means virtually anything related to the volume of domestic sales that is brought to the agency's attention, but Defendants interpret this language to mean that the agency must calculate the volume of domestic sales based on precise figures that have been substantiated in documents submitted to other federal agencies. Given the text and purpose of the FETRA, this Court is persuaded that Defendants are correct.

#### a. The Plain Text Of The Provision Supports Defendants' Reading

First of all, the term "other relevant information" appears as part of a list that opens with a reference to "information provided by manufacturers and importers pursuant to subsection (h)[.]" *See* 7 U.S.C. § 518d(g)(1). By stating plainly that the

CCC must calculate the volume of domestic sales based on the submissions that the manufacturers and importers have made pursuant to subsection (h) *and also* "other relevant information," *id.* § 518(g)(1), Congress likely intended for the category of "other relevant information" to mean information that is *similar to* the excise tax returns and customs forms that legally operating manufacturers and importers submit pursuant to subsection (h)—so say "the established interpretative canons of *noscitur a sociis* and *ejusdem generis*[.]"  *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (noting these canons mean that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar to those enumerated by the preceding specific words"(citation and internal quotation marks omitted)); *see also Gutierrez v. Ada*, 528 U.S. 250, 255 (2000) ( "[W]ords . . . are known by their companions"); *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) (explaining that, when terms that begin a list are specific and belong to "an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage").  And basic principles of statutory interpretation also dictate that terms listed in a statute are to be read narrowly, while still giving effect to each word.  *See CSX Transp., Inc. v. Alabama Dep't of Revenue*, 562 U.S. 277, 295 (2011) ("We typically use *ejusdem generis* to ensure that a general word will not render

specific words meaningless."); *see also, e.g.*, *Yates v. United States*, 135 S. Ct. 1074, 1087 (2015) (plurality opinion) (applying the canons of *noscitur a sociis* and *ejusdem generis* in holding that fish do not fall within the Sarbanes–Oxley Act's prohibition against knowingly destroying "any record, document, or tangible object" because "[h]ad Congress intended 'tangible object' in [the statute] to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to 'record' or 'document'").

Applying these principles here, the first listed item listed in section 518d(g)(1) is a specific reference to certain excise tax returns and customs forms that tobacco-product manufacturers and importers are required to submit to the U.S. Alcohol and Tobacco Tax and Trade Bureau.  *See* 7 U.S.C. §§ 518d(g)(1), (h)(2).  This means that the succeeding "other relevant information" phrase should likely be interpreted to include information that is similar to such documents, *see Yates*, 135 S. Ct. at 1087, and Defendants are correct that similar information is that which has been substantiated by a federal agency and has precise figures for the amount of timing of removals of tobacco products.  (*See* Defs.' Supp'l Mem., ECF No. 20, at 3.)  It is also clear that Plaintiffs' argument that "other relevant information" should be construed in the dictionary sense of that phrase—and, according to Black's Law Dictionary, "[i]nformation is 'relevant' if it is '[l]ogically connected and tending to prove or disprove a matter in issue" (Pls.' Opp'n at 33–34 (quoting Black's Law Dictionary 1404 (9th ed. 2009) (second alteration in original))—clearly reads the CCC's statutory directive too broadly, because it essentially ignores subsection (g)(1)'s preceding specific reference to information provided pursuant to subsection (h) and, in effect,

renders Congress' specific mention of subsection (h) meaningless. *See Keffler*, 537 U.S. at 385 (holding that a general term that follows specific terms should be read as similar to the specific terms, otherwise, Congress's use of the specific terms would be unnecessary).

### b. The Purpose Of The FETRA Confirms Defendants' Construction

This Court is also persuaded that permitting the CCC to reject imprecise removal information that has not already been verified by other government agencies when the agency undertakes to determine the volume of domestic sales of tobacco products is precisely what Congress intended. Although Congress plainly required the CCC to make assessment determinations based on variables such as the gross volume of domestic sales, 7 U.S.C. § 518d(e), and also mandated that the gross volume of domestic sales be determined based on excise tax and customs forms that the manufacturers submit to the agency as well as "other relevant information[,]" *id.* § 518d(g)(1), Congress did *not* provide the CCC with the power to investigate or otherwise substantiate any of the information that, according to the FETRA, must be used to calculate assessments—*i.e.*, the CCC cannot issue subpoenas for documents from companies that are suspected of illegally underreporting sales, or compel testimony from individuals who smuggle cigarettes off of Indian reservations, or order agents to stake out businesses that may be selling illicitly imported cigarettes. Thus, if the reported removals are going to be substantiated at all, the CCC must get this verification from *other* agencies (those that have the tools that are necessary to determine the accuracy of the reported figures), which strongly suggests that Congress intended for the CCC to be more of an *accounting* agency than an investigative one. That is, although Congress certainly could have required tobacco-product manufacturers

and importers to self-report their removal figures directly to the CCC for that agency to verify and credit, it chose not to do so, thereby indicating that it had no intention of authorizing the CCC to engage in the kinds of investigations that Plaintiffs admit would be necessary to verify the illegal sales figures at issue here.

And it makes eminent sense that Congress intended for the CCC to rely only on information that other federal law enforcement agencies (such as the Department of the Treasury, the Department of Homeland Security, and the Department of Justice) have already verified; otherwise, it would be far too easy for tobacco-product manufacturers and importers to impact the assessment calculation in inaccurate and unwarranted ways. There is nothing in the FETRA statute or its history that suggests that Congress intended for the CCC to calculate TTPP assessments using *unreliable* figures regarding the volume of domestic tobacco sales or any of the other specified variables, and given the lack of investigative authority, the only way for the CCC to ensure the accuracy of the removal data that the agency relies upon to fulfill its statutory duty to calculate the volume of domestic sales is for the agency to accept only the information that has already been reported in official government documents.  (*See* Defs.' Mot. at 6, 14.) Thus, this Court is persuaded that Defendants' reading of "other relevant information" to mean information that is substantiated by a federal agency and has precise figures for the amount of timing of removals of tobacco products is consistent with the statutory scheme and makes good sense.

### c.  Plaintiffs' Statutory Argument Is Unpersuasive

Plaintiffs' argument to the contrary fails in several respects.  First, Plaintiffs have managed to turn the FETRA on its head with their contention that "nothing in the statute permits [CCC] to categorically exclude information just because it has not been

32

verified or corroborated by other government agencies." (Pls.' Opp'n at 33.) This assertion is dramatically circular—it assumes that Congress intended for the agency to accept any and all information that the manufacturers present to it regarding the volume of domestic sales regardless of whether or not the information has been verified as accurate, when, as explained above, the text and purpose of the FETRA strongly suggest otherwise.

Plaintiffs have also erected a menacing straw man with their vigorous contention that Congress has specifically directed the CCC to make assessment determinations based on market share, and that, by failing to include illegal sales, the agency has shirked its statutory responsibility in a manner that transgresses the FETRA's dictates. (*See* Pls.' Opp'n at 36 (contending that the CCC has both "exaggerate[d] the challenge of complying with FETRA and shrugg[ed] off [its] legal duty to make a reasonable determination concerning factors prescribed by Congress").) Plaintiffs are correct to point out that "[t]he D.C. Circuit has repeatedly recognized that when Congress directs an agency to make particular factual determinations in carrying out a regulatory scheme, the agency's self-professed incompetence is no excuse for noncompliance." (*Id.* at 37 (citing *NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C. Cir. 2010) ("[A]n agency may not shirk a statutory responsibility simply because it may be difficult.") (superseded on unrelated grounds by statute)); *see also Cobell v. Salazar*, 573 F.3d 808, 813 (D.C. Cir. 2009); *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005). However, Plaintiffs have failed to acknowledge that what really was at issue in the D.C. Circuit cases that Plaintiffs rely upon was the agency's refusal to do something that Congress had specifically directed the agency to do, rather than the

agency's well-reasoned determination that, in the course of undertaking to fulfill its statutory duty, it need not consider a particular factor that an interested party wanted the agency to take into account.

In *Chamber of Commerce*, for example, the Securities and Exchange Commission ("SEC") issued a rule that imposed two restrictions on mutual funds pursuant to a federal statute that required the SEC to consider whether promulgating a rule under the statute would be "consistent with the public interest" insofar as it would "promote efficiency, competition, and capital formation." 412 F.3d at 142 (quoting 15 U.S.C § 80a-2(c)). When the plaintiffs objected to the rule on the ground that the agency had shirked its obligation to consider the public interest by failing to determine whether the costs of the rule might impede efficiency, competition, and capital formation, the SEC responded that it could not consider that statutory factor because, despite the statute's clear mandate to do so, the agency had no "reliable basis" for determining such costs. *Id*. Rejecting the SEC's argument, the D.C. Circuit explained that the "difficulty" of assessing the full cost of the rule did "not excuse the Commission from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Id.* Similarly, in *Cobell*, the D.C. Circuit held that that, where Congress had directed the Department of the Interior to undertake an extremely complex accounting of a federal Native American trust fund, the agency was not free to "throw up its hands and stop the accounting[,]" but instead must "provide[] the best accounting it can." 573 F.3d at 813.

Here, by contrast, the FETRA makes no analogous statutory command that the CCC consider and/or address the volume of illicitly manufactured cigarettes. *See*

*Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307, 314–15 (D.D.C. 2009), *rev'd on other grounds sub nom. Prime Time Intl., Inc. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010) (holding that CCC need not make independent determinations regarding the volume of all smuggled tobacco products in creating its market share calculations). (*See also* Defs.' Reply Br. in Supp. Of Mot. to Dismiss, ECF No. 14, at 6 (noting that "[t]he commonality of [*Chamber of Commerce* and *Cobell*] is that they both involved a clear statutory command on an issue central to an agency's mission" but that "neither of those conditions is satisfied here").)  Instead, the FETRA's direction to the CCC is that the agency must levy assessments against tobacco-product manufacturers and importers and distribute the collected monies to tobacco growers, and in doing so, it must base the assessment calculations on certain factors, including the volume of domestic sales for various classes of tobacco products.  There is no dispute that the CCC has, in fact, generated a "volume of domestic sales" figure that is based on the subsection (h) submissions and whatever other information the Secretary deems relevant—in clear contrast to the agencies that totally eschewed their mandated duties in *Chamber of Commerce* and *Cobell*.  And the CCC has also accomplished its core mission of collecting and distributing tobacco subsidy payments, notwithstanding the fact that, in doing so, the agency has exercised its considerable discretion under the statute to reject certain information related to the "volume of domestic sales" factor due to the unreliability of the unverified data that Plaintiffs presented to it.

It is also clear to this Court (and Plaintiffs do not deny) that Congress has vested the CCC with the discretion to filter out *irrelevant* information related to the volume of domestic sales—*i.e.*, the agency does have the power to reject *some* manufacturer

submissions.  (*See, e.g.*, 6/9/2015 Mot. Hr'g Tr. ("Hr'g Tr."), ECF No. 15, at 56:1–13

(Plaintiffs' counsel conceding that the CCC could legitimately reject at least some types

of information notwithstanding a manufacturer's attempt to offer them, such as

"astronomy charts").)  Thus, Plaintiffs are hard-pressed to explain their contention that,

when exercising its discretion to separate the wheat from the chaff in determining the

volume of domestic sales, the CCC acts contrary to the FETRA's mandates if the

agency deems unreliable (and thus irrelevant) information that has not already been

verified by another federal agency and that, the agency says, it is ill-equipped to verify

itself.

Plaintiffs' argument that the FETRA requires the CCC to credit the GlobalSource

findings or otherwise undertake to verify the illegal product sales figures itself—*i.e.*,

that "nothing stops [CCC] from hiring (or reassigning) appropriate personnel to gather

whatever additional information it believes is important to include in the administrative

record" (Pls.' Supp'l Mem., ECF No. 18, at 2), and the "[CCC] can analyze the

information submitted and, exercising its own judgment, make a reasonable estimate of

the amount of unreported sales" (*id*. at 1)—likewise ignores important statutory context.

As explained, it was Congress's clear intention that the CCC's role in collecting

assessment amounts and distributing money to tobacco farmers was to be narrow and

well-defined, and the limited authority that Congress provided to the CCC in this regard

is manifestly inconsistent with Plaintiffs' insistence here that the agency can dispatch

its employees to gather and analyze evidence, and/or effectively make binding factual

determinations regarding the scope of illegal behavior in course of making the required

assessment calculations.  This Court has no doubt that Plaintiffs and their fellow

tobacco-product manufacturers and importers would be up in arms (on lack-of-statutory-authority grounds) if the CCC attempted to go behind the removal numbers that are routinely submitted to it—whether to question the accuracy of those figures directly or to seek further corroboration—and yet, that is precisely what Plaintiffs contend that the CCC has the statutory authority to do (but won't do) regarding the illegal sales report in this case.  But this Court finds that Plaintiffs cannot have it both ways: since it is clear beyond cavil that Congress intended for the CCC to make an accurate determination of each manufacturer's and importer's assessment amount (which Plaintiffs concede), and it is also clear that Congress has not provided the CCC with the tools to verify the accuracy of the information it receives (which Plaintiffs appear to acknowledge and would undoubtedly emphasize if the agency attempted any such verification of Plaintiffs' own removal figures), then Plaintiffs cannot deny that Congress must have intended for the agency to opt to rely on information that has been verified by other federal agencies.   Put another way, while Plaintiffs here assert that nothing in the FETRA permits the CCC to *exclude* domestic sales information that has not been verified by another agency, as this Court reads the statute, nothing in the FETRA requires the CCC to *include* such information, and in fact, the statute's text and purpose strongly suggests that relying on other reliable sources is precisely what Congress wanted the CCC to do.

Finally, to the extent that Plaintiffs seek to appeal to general principles of fairness and proportionality (*see* Hr'g Tr. at 4:13–4:22), their reliance on such principles is misplaced.  Plaintiffs stress that "Congress was clear bordering on redundant that an assessment must be proportionate to a manufacturer's share of the

*entire* market for the relevant tobacco product[,]" (Pls.' Opp'n at 27–28 (emphasis in original)), and thus, the CCC cannot fairly exclude unaccounted-for illegal cigarette sales from the FETRA calculation because to do so requires those manufacturers that operate legally to pay greater assessments than are warranted given their actual market share.  (*See* Pls.' Supp'l Mem. at 1 ("When the government is aware of manufacturers unlawfully failing to report sales of tobacco products, and the government chooses not to enforce the laws against those non-compliant manufacturers, the financial burden of that non-enforcement decision should not be borne by law-abiding manufacturers.").)  Plaintiffs liken this situation to a State extracting additional sums from law-abiding drivers to cover toll booth shortfalls:  "[I]f I'm driving on a toll road and somebody speeds by me past the toll booth, it's not usual for the toll operator to then ask me [to] pay twice just because someone else didn't pay their fair share."  (Hr'g Tr. at 4:18–4:22; *see also id*. at 48:14 (suggesting that, instead of collecting more from other manufacturers, the government may make up the subsidy losses by "tak[ing] it out of its own general appropriations").)

Albeit clever, Plaintiffs' toll booth analogy is transparently inapposite, because the assessments that tobacco-product manufacturers and importers must pay under the FETRA *do not arise pursuant to a general tax scheme*, such as a highway toll collection effort.  Instead, as explained above, the FETRA is premised on the fact that there is a subsidy "debt" that the federal government has traditionally paid to tobacco farmers (a sum certain), and the statute is specifically designed to *transfer* the burden of bearing this cost to tobacco manufacturers and importers.  *See supra* at Part I.A; *see also* 7 U.S.C. § 518d (Congress titled the statute "[u]se of assessments as source of funds for

payments"). In this regard, then, rather than operating like a general toll or tax, the FETRA is much more akin to the familiar legal framework of joint and several liability, which plainly rejects the notion that the victim should be left wanting out of a misplaced sense of proportional fairness to the tortfeasors and, instead, "forces all parties responsible for the harm to bear the burden of any lapses in liability." *United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 26–27 (D.D.C. 2004); *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 67, at 475 (5th ed. 1984) (noting joint and several liability places "the aggregate wealth of the defendants . . . behind the judgment," irrespective of "the proportionate responsibility of the defendants individually for the loss"). To be sure, Congress did state in the FETRA that "[n]o manufacturer shall be required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume," 7 U.S.C. § 518d(e)(2), but the most obvious aspect of the FETRA assessment scheme is Congress's clear intention to relieve the public fisc of the continued burden of tobacco subsidies—which means that Plaintiffs are unquestionably mistaken to suggest that fairness to them requires the CCC to include illegal sales in the assessment calculus, thereby generating assessment figures that can never be recouped, and make up the difference in subsidy payments owed to tobacco farmers by "tak[ing] it out of [the government's] own general appropriations[.]" (Hr'g Tr. at 48:14.)

In sum, Defendants have persuaded the Court that the CCC was correct to interpret the FETRA's "other relevant information" language to mean only precise figures that have been substantiated by another federal agency and that the agency acted consistently with the text and purpose of the FETRA when it refused to reduce

Plaintiffs' 2013 assessments based on the unsubstantiated estimates in their GlobalSource report.  Therefore, Count One of Plaintiffs' complaint fails to state a claim upon which relief can be granted.

**B.  The Remedy That The FETRA Provides Precludes Plaintiffs' APA Claim**

Plaintiffs have not only claimed that Defendants' rejection of the GlobalSource report violated the FETRA, but also that this same conduct violates the APA's prohibition on arbitrary and capricious agency decision making.  (*See* Compl. ¶¶ 200–09.)  In this respect, Plaintiffs' complaint makes the same claim of wrongful agency behavior twice—once under FETRA, and again under the APA.  For the following reasons, this Court agrees with Defendants that an APA claim is not properly entertained as an alternative basis for ruling in the Plaintiffs' favor, and therefore Plaintiffs' APA claim must be dismissed.

Section 704 of the APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  Thus, "if an adequate remedy at law exists" for the agency action about which the plaintiff complains, then "equitable relief is not available under the APA."  *Cohen v. United States*, 650 F.3d 717, 731 (D.C. Cir. 2011).  Furthermore, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'"  *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005)).  Therefore, "in determining whether an adequate remedy exists," courts "focus[] on whether a statute provides an independent cause of action or an alternative review procedure."  *El Rio Santa Cruz Neighborhood Health Ctr.*, 396 F.3d at 1270.  For

40

example, courts will find alternative relief is adequate "where a statute affords an opportunity for *de novo* district-court review" of the agency action. *Id.* In such cases, courts reason that "[w]hen Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). By contrast, courts will find that alternative relief is not adequate where the remedy offers only "doubtful and limited relief[,]" *Garcia*, 563 F.3d at 522 (quoting *Bowen*, 487 U.S. at 901), because Congress's intent to avoid the duplication of remedies "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action[,]" *Bowen*, 487 U.S. at 903.

The FETRA provides that "[a]ny manufacturer or importer aggrieved by a determination of the Secretary with respect to the amount of any assessment may seek review of the determination in the United States District Court for the District of Columbia" or in the district in which it resides or has its principal place of business "at any time following exhaustion of the administrative remedies." 7 U.S.C. § 518d(j)(1). The statute further states that "[t]he court shall restrain collection of the excessive portion of any assessment or order a refund of excessive assessments already paid, along with interest . . . , if it finds that the Secretary's determination is not supported by a preponderance of the information available to the Secretary." *Id.* § 518d(j)(3). It is clear, then, that the FETRA presents a canonical example of legislation that "affords an opportunity for *de novo* district-court review" of the agency action. *El Rio Santa Cruz Neighborhood Health Ctr.*, 396 F.3d at 1270.

Plaintiffs appear to concede that this is the case.  (*See* Pls.' Opp'n at 31 n.3 ("FETRA provides a complete remedy here . . . and, for that reason, this case could be fully resolved on the FETRA claim alone.").)  Nevertheless, Plaintiffs insist that this "is no basis for dismissing the APA claim at this stage" because they believe they may plead these similar but mutually exclusive claims in the alternative.  (*Id.*)  While the Federal Rules of Civil Procedure may allow alternative pleading as a general matter, *see* Fed. R. Civ. P. 8(d)(2), pleading an APA violation in the alternative is not permissible where, as here, an adequate alternative remedy exists.  *See Mittleman v. U.S. Treasury*, 773 F. Supp. 442, 449 (D.D.C. 1991) (holding that, when an APA claim is "simply a restatement" of a claim brought under another statute that provides an adequate vehicle for seeking relief, the APA claim "is properly dismissed" under section 704 of the APA).  In fact, courts routinely dismiss alternatively pled APA claims upon finding that another statute offers an adequate alternative remedy.  *See, e.g.*, *Garcia*, 563 F.3d at 523–26 (affirming dismissal of plaintiffs' alternatively pled APA claims where the federal statute also relied upon provided an adequate alternative remedy); *Am. Rd. & Transp. Builders Ass'n v. E.P.A.*, 865 F. Supp. 2d 72, 80, 83 (D.D.C. 2012) (same); *Feinman v. F.B.I.*, 713 F. Supp. 2d 70, 77–78 (D.D.C. 2010) (same).  This Court will do the same here.

## IV.   CONCLUSION

This Court is persuaded that, when Congress directed the CCC to base its calculation of the volume of domestic sales of tobacco products for the purpose of the FETRA on "other relevant information[,]" Congress intended for the agency to have the discretion to decide that such information should consist of removal-related figures that

are precise and that have been verified by another federal government agency, just like those in the excise tax forms and customs forms to which section 518d(g)(1) specifically refers.  Thus, Plaintiffs' contention that it violated the FETRA when the CCC decided to reject what it considered to be imprecise and unverified illegal sales figures fails as a matter of law.  Furthermore, Plaintiffs' alternative legal contention— *i.e.*, that the same agency conduct that purportedly violated the FETRA violates the APA—is not appropriately maintained, given that the FETRA would have provided Plaintiff with an adequate remedy all by itself.

Accordingly, as set forth in the accompanying order, Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) will be **GRANTED**, and Plaintiffs' complaint will be **DISMISSED**.

DATE:  September 17, 2015

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

43